UNITED STATES, Appellee

v

JESSE C. SIMS, Airman First Class, U. S. Air Force, Appellant

7 USCMA 88, 21 CMR 214

No. 7978

Decided May 25, 1956

*Captain John H. Leonard* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis* and *Lieutenant Colonel Francis P. Murray.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convened at the Royal Air Force Station, Burtonwood, Lancashire, England, found the accused guilty of five violations of the Uniform Code of Military Justice and sentenced him to a bad-conduct discharge, partial forfeiture of pay, and confinement at hard labor for 24 months. The convening authority and a divided board of review affirmed the findings and the sentence. Pursuant to Article 67(b), Uniform Code of Military Justice, 50 USC § 654, the Acting The Judge Advocate General of the Air Force forwarded the record of trial to this Court for review of a number of issues.

Only four of the five offenses charged are material to the certified issues. Charge I, specification 2, alleges that on May 27, 1955, on Barrowhall Lane, Great Sankey, Lancashire, England, the accused was driving while drunk, in violation of Article 111, Uniform Code of Military Justice, 50 USC § 705. The accused was acquitted of this charge. Specification 3 of Charge I alleges that at the same time and place, the accused operated his car in a reckless manner by "driving at a speed in excess of 30 miles per hour without his headlights being on while drunk and without taking proper notice of pedes-

trians using the highway," and that he struck and injured Airman Second Class D. Carroll. The court convicted the accused of this charge, but it excepted the words "while drunk." Charge II alleges that in the same accident and because of his culpable negligence, the accused killed Airman Second Class Ronald Lord. The accused was found guilty of this charge. Charge III alleges that the accused unlawfully left the scene of the accident, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was convicted of this offense.

The first certified question requests review of the sufficiency of the evidence to support the findings of guilty of Charge I, specification 3. The second question asks for a similar review of the evidence as to Charge II, "in view of the court's findings with respect to Specifications 2 and 3, Charge I." In other words, aside from any question of drunkenness, is the evidence sufficient to support the court-martial's findings that the accused was "reckless" and culpably negligent in the operation of his vehicle when he struck Airmen Carroll and Lord.

No dispute exists as to the fact that the accused was the driver of an English-type 4-door sedan which struck

Carroll and Lord on the date and at the place alleged. It is also undisputed that Carroll and Lord were injured and that Lord died as a result of his injuries. The controversy on this appeal centers around the circumstances of the accused's operation of the car. The accused maintains that the evidence shows, at most, simple negligence.

The accident occurred on May 27, 1955, at about 10:55 p.m. on Barrowhall Lane, Great Sankey, Lancashire, England. The night was clear and dry. The street is about 21–1/2 feet wide and runs in a north-south direction. Northbound vehicular traffic moves on the left side of the road. On the right, or east side, a dirt path 4–1/2 feet wide parallels the road. At the time of the accident, this path ran from the southern end to about half the length of the lane. The path is intended for pedestrian use, but "very very few" actually use it. At the south end, Barrowhall Lane intersects Park Road; at the north, it terminates at one of the gates leading into the United States Air Force Station. The length of the street is about 847 yards. It is illuminated by five street lights. The two end lights are fluorescent and the others are "ordinary street lights." The latter are spaced at about 400-foot intervals. For about 400 yards from the Park Road intersection, the lane runs straight.

Carroll and Lord, accompanied by Airmen Fitzgerald and Foster, left the Butcher Arms, a local tavern, to return to their base. They took a case of beer with them. Turning on to Barrowhall Lane, they proceeded in pairs in the same direction as the northbound flow of traffic. Foster and Carroll were ahead; Fitzgerald and Lord were directly behind them, carrying the case of beer. Lord was on the outside about six feet from the west edge of the road. None of the group paid particular attention to the vehicular traffic. A "couple of cars" passed them without incident. When they had proceeded about 360 yards (as determined by the measurements of Police Sergeant L. Smyth of the Lancashire Constabulary), Lord and Carroll were knocked down by an auto.

Foster, Fitzgerald, and Carroll testified that they had had no warning of the car's approach. They saw no headlights and heard no horn or other indication of the presence of the vehicle. After the impact, Foster saw a car about 30 yards forward. He estimated its speed at 30 miles per hour "or better." Fitzgerald saw it about 20 feet ahead and judged its speed to be between 35 and 40 miles per hour. Neither noticed any rear light on the car. Police Sergeant Smyth examined the area within 15 minutes of the accident. He found no skid marks. His measurements indicate that the accident occurred at a point between two street lamps, one being about 300 feet south and the other about 100 feet north. He testified that the illumination at that point was such that a person could see "a little," but looking north toward the street light, the visibility was "definitely" better. Carroll testified that there was a "light just ahead of us. We could see about 50 feet." Foster also said that he saw the light ahead.

About three hours after the accident, the Air Police apprehended the accused in his hut on the base. He was roused from his sleep and taken to Air Police headquarters. In the opinion of the arresting policeman, the accused was drunk. However, shortly afterward, the accused was examined at the dispensary by Captain H. W. Lipow, an Air Force medical officer. In Doctor Lipow's opinion, the accused seemed well-coordinated and well-oriented. Although the accused's breath smelled of alcohol, there was no "obvious indication of slurring or anything."

On May 31, 1955, the accused voluntarily submitted a sworn statement to a special agent of the Office of Special Investigations. His statement was admitted in evidence. In many respects, it coincides with the accused's trial testimony, but in others, it is different. To the extent that the pretrial statement and the accused's testimony coincide, and as corroborated by the testimony of his wife, his mother-in-law, and his brother-in-law, it appears that about 6:30 p.m. he was with his wife at the mother-in-law's home. They went to a pub where the accused had

a double rum. With a friend, they proceeded to another pub where the accused had a second double rum. Accompanied by his wife, the accused returned to the base to deliver a bottle of rum which he had purchased for Airman Wallbaum. He had a "small drink" while waiting for Wallbaum to dress. Wallbaum, the accused, and his wife returned to her mother's home. There they had sandwiches and coffee and Wallbaum had a drink. Later Wallbaum became noisy and profane. The accused tried to get him to go to sleep, but did not succeed. At his mother-in-law's request, he set out to take Wallbaum back to the base. Assisted by his brother-in-law, he got Wallbaum into the back of his car and started for the base.

Wallbaum appeared as a witness. He could not, however, testify as to any of the circumstances surrounding the accident. Earlier in the evening he had been drinking at the NCO Club and in his hut. By the time he reached the accused's home, he was "fairly drunk" and he "passed out" after he took a drink there. He testified that he did not remember leaving the accused's home and he did not remember anything that happened enroute. He only knew that he awoke about 9:00 o'clock the next morning in his own hut on the base. He admitted, however, that in a pretrial statement, given to Chief Inspector Teasdale of the Lancashire Constabulary, he said that he recalled the accused telling him that he was going to drive him to the base; when they reached it, he "got out of the car from the front passenger seat and went to . . . [his] hut."

According to the accused's testimony, he started from his home with his headlights on. He slowed down at the first intersection. Wallbaum tried to get out of the car. The accused "completely stopped." He took Wallbaum out of the back seat and "shoved him in the front." He continued on to Liverpool Road. On that street he turned off the headlights and put on the side or parking lights because he noticed "a few trucks and cars . . . driving" with such lights. From Liverpool Road, he proceeded to Park Road and the Bar-

rowhall Lane intersection. As he turned into the lane, Wallbaum opened the front door, but the accused "managed" to close it "just in time." He continued on Barrowhall Lane at about 30 miles per hour.

Having driven over the lane for about two years, the accused was "very familiar" with it. On occasion, he used his sidelights. These lights provide forward illumination for only about 6 to 8 feet, but the light from the street lamps enabled him to "make out the road from one street light to another enough to drive, but you had a dark place in between." The intersection at Park Road was the "best lighted" part, and at that point a person could see for about 150 or 200 yards down Barrowhall Lane. The "poorest" lighting was "right about where the accident occurred." There the visibility was "maybe" 200 or 300 feet.

At the trial, the accused maintained that just before the accident Wallbaum "was fooling around" the door and it again came open. Once more, he reached over to close it. When he looked up 2 or 3 seconds later, he saw "these figures" about 15 feet away. He "wheeled" to the right and something smashed into the windshield. He did not stop. However, on May 28th, he had told Inspector Teasdale that he "spotted four guys walking along the road . . . about 30 yards away." He "jammed" his brakes and swerved but the car struck one of the pedestrians "who was carrying a crate of beer." He also told the Inspector that he was alone and that the accident probably would not have happened if he had had his headlights on. In his sworn statement of May 31st, he again made no mention of reaching across Wallbaum to close the open door of the car. Thus, he said:

". . . About 400 yards down Barrow Hall Lane I suddenly saw four men walking along the left side of the road. As well as I recall they were walking four abreast. The two nearer the center of the road were carrying something between them. I learned later that it was a case of beer. I tried to avoid hitting the men by swerving to the right, but I

couldn't. Suddenly my left windshield shattered. I didn't know whether I had hit something or someone had thrown something. I slowed down and looked back but didn't see anything. With WALLBAUM in his condition and realizing the trouble I had been in already, plus the fact that I panicked a bit at the time, I drove on without stopping."

In our opinion there is substantial evidence to support the court-martial's finding that the accident ▆▆▆▆▆▆ ▆ was caused by the accused's reckless and culpably negligent operation of his car. His testimony regarding his concern for the safety of his companion merely emphasizes his extreme disregard of the foreseeable consequence of the manner in which he was driving the car. By his own admission, the accused was "very familiar" with Barrowhall Lane. He must have known, therefore, that he could expect to encounter pedestrians on the roadway. The lane leads to the gate of the Air Force Base and there was "always somebody" on it. From Wallbaum's two previous attempts to open the car door, the accused could reasonably expect that Wallbaum would do something which would require his immediate attention. Yet, he took no safety measures whatever. On the contrary, his own testimony shows that he was completely inattentive to the road. When he looked away from the car door and saw the pedestrians in the roadway, he was allegedly only 15 feet from them. Since the accused purportedly looked away for two or three seconds, simple computation indicates that he travelled a distance of 88 feet. It would seem, therefore, that the accused looked away from the road at a point that was only 103 feet from the pedestrians. However, the accused testified that he could see for a distance of 200 or 300 feet at the most poorly lighted part of the lane. Thus, had he been observing the road before the alleged emergency created by Wallbaum, he should certainly have seen the pedestrians. By reason of the fact that he did not see them, the court-martial could fairly conclude that he paid no attention to the road, though his thorough familiarity with it should have made him anticipate the presence of pedestrians. Coupling these circumstances with the accused's flight from the scene, the court-martial could reasonably find that he was culpably negligent in the operation of his car when it struck Carroll and Lord.

Taking the accused's pretrial version of the accident as true, his culpable negligence is also evident. From his pretrial statements, it appears that he was aware of the pedestrians when he was at least 150 feet away. Purportedly, he applied his brakes but there were no tire marks on the roadway of the kind normally associated with "jammed" brakes. The testimony of Foster and Fitzgerald shows that he did not reduce his speed. He gave no warning signal of any kind. There was no oncoming traffic to compel the accused to stay on his side of the road if he wanted to pass without warning the pedestrians. To run into them under these circumstances is evidence of reckless and culpable negligence in the operation of the vehicle. Therefore, the certified questions regarding the sufficiency of the evidence to support the findings of guilty of Charge I, specification 3, and Charge II and its specification are answered in the affirmative.

The other certified questions relate to matters of procedure. Before the court retired into closed session for deliberation on the findings, the law officer instructed them as follows:

"LO: When the court has finally reached its findings, it may, if it desires, call upon the law officer to assist in putting those findings in proper form prior to announcing them in open court. In that event, the reporter will come in with the law officer to record verbatim the communications between the president and the law officer. The president of the court will announce to the law officer the findings you have reached, and the law officer will assist in putting them in proper form to be announced in open court. You will not, at that time, request additional instructions or engage in any other conversation with either the law officer or the reporter."

An hour and a half later the law officer and the reporter were called into closed session. The following discussion took place:

"PRES: We found him guilty of Specifications 1 and 3 of Charge I and not guilty of Specification 2, Specification 2 being driving while drunk on the 27th; and the question is whether this requires deletion of wording in Specification 3 in writing up the findings. In other words, should we say to Specification 3, Charge I, guilty, except the words, 'while drunk?'

LO: Did you decide that he was driving while drunk?

PRES: No. We found him not guilty. One of your allegations in Specification 3 was that he was driving while drunk.

LO: One of them?

PRES: Yes, sir.

LO: Does that answer your question?

PRES: No, I guess I am asking you, then, must he have been drunk in order to be guilty as written in Specification 3.

LO: No.

PRES: If we found him not guilty here, do we have to make exceptions in this specification in writing him guilty?

LO: If you didn't, then your findings would be inconsistent.

PRES: That is my point. The court finds on Specification 3, Charge I, guilty, except the words, 'while drunk.'

LO: All right, sir. You made a finding of guilty in regard to Specification 3 of Charge I with exceptions.

PRES: With exception of the drunkenness.

LO: And this wording will be all right.

PRES: And this wording will be all right?

LO: Yes, sir.

PRES: This is a proper thing to call you in about?

LO: Yes, sir. Have you any further questions?

PRES: No, that is all."

One minute after the law officer and the reporter left the closed session the court reopened and announced its findings. The question raised by the certificate for review is whether the law officer's comments constituted unlawful participation in the court's findings to the prejudice of the accused.

The record clearly shows that the court had reached its findings before the law officer came into the closed session. Thus, the president of the court emphasized the fact that the "court finds on Specification 3, Charge I, guilty, except the words, 'while drunk,'" and asked the law officer whether the wording the court had chosen to express its verdict was correct. True, the discussion by the law officer on inconsistent findings can be regarded as an additional instruction. However, this instruction did not affect the court's findings. The court had determined the findings before the instructions were given, and those findings were announced in open court one minute after the law officer left the closed session. We answer the certified question in the negative.

The remaining certified question related to the "cumulative effect of the errors of record." The certificate does not specify the errors; nor does the accused particularize them. However, the accused refers us to the opinion of the dissenting member of the board of review. We have read the opinion with care. The errors upon which the dissenting member relies are mostly matters of discretion. We cannot say that the law officer and the majority of the board of review erred, as a matter of law, in approving the matters condemned by the dissenting member. We conclude, therefore, that the accused was accorded a fair trial free from any single or cumulative errors which prejudiced him in a substantial right.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring in the result):

I concur in the result.

As reflected in the language of the certificate, The Judge Advocate Gen-

eral of the Air Force would have us answer a total of four questions if the first issue, which deals with a closed session, is answered in favor of the Government. It is so answered by us, and while I agree with the Chief Judge in his results as to the remaining questions, I prefer to express my own views in two areas. So far as I am ■■■■■■ concerned, the principal ■ question to be resolved is whether the accused, at the time and place alleged, drove his car in a culpably negligent manner. A decision on that question will resolve the issue set out in two of the certified questions, as the findings of reckless driving and involuntary manslaughter hinge on one answer. The board of review, in a divided opinion, held there was sufficient evidence to support the findings. In its principal opinion, the board did not develop any reasons supporting the verdict, but the dissenting member analyzed thoroughly every evidentiary aspect of that issue. He makes a good argument in support of his position, but it is to be remembered that members of boards of review have fact-finding powers, and he may have decided to give great weight to accused's testimony when he concluded the evidence was insufficient to satisfy him beyond a reasonable doubt that the accused was guilty. The same path is not open to us, for we have not been clothed with fact-finding powers or with the authority to assess credibility, and we look to the record merely to ascertain whether there is sufficient evidence to sustain the findings.

There are certain evidentiary items which, if standing alone, might establish no more than simple negligence, but when considered collectively, they add up to the quantity and quality of evidence necessary to support the finding that the accused recklessly and wantonly drove his car in utter disregard for the rights of others. Obviously, in making my determination as to the sufficiency of the evidence, I am bound by the finding of the court-martial that the accused was not driving while drunk at the time of the accident, but I am not precluded from using the fact that prior thereto he had been drinking strong alcoholic beverages. Apparently the members of the court-martial were not satisfied beyond a reasonable doubt that the quantity of rum he had consumed had dulled his mentality to a degree where they were willing to find he was definitely under its influence, but that is not to say that his capacity to observe and react promptly was not impaired in some degree. However, that is a relatively insignificant factor in this setting, as the other facts are more than sufficient to establish culpable negligence. The accident happened on May 27, 1955, at about 10:55 p.m. The night was clear, and apparently in England on that date and at that time of night, maximum darkness had not arrived but was fast approaching. Illumination from automobile headlights was necessary to permit proper observation of the roadway, and yet the evidence shows the accused was driving with side lights which he conceded would not illuminate sizeable objects until they were within six to eight feet of the front of the car. He was traveling in excess of thirty miles per hour along a straight stretch of road which was poorly lighted by street lights located at intervals of four hundred feet. There was nothing to prevent him from having a clear view down the highway, yet he failed to see four airmen walking along the surfaced portion of the road until it was too late to avoid striking them. There was ample room remaining on the main traveled part of the highway to permit the car to pass by the airmen and there was no oncoming traffic to prevent the accused from altering his course to avoid the collision. The highway bore no evidence of an emergency application of the brakes, the accused gave no warning of his approach, and he knew the portion of the highway where he was driving was used extensively by airmen as a footpath. His car was damaged quite badly, a case of beer must have shattered his windshield; and he killed one airman. His guilty state of mind is best exemplified by his reaction to the accident. He failed to stop to ascertain the extent of damage to his car or injuries to the pedestrians and continued on to camp and went to bed.

In an effort to escape conviction, the accused contends the record shows no more than ordinary negligence. I disagree, and it matters not which horn of the dilemma he selects to support his contention. On the one hand, if, as he asserts, the sky was light enough and atmospheric conditions were clear enough so that he could see without the use of headlights, his conduct in running down four airmen on a straight section of the road was so grossly negligent as not to permit discussion. When four men, two of whom are carrying a case of beer, are clearly visible for a considerable distance and are run down by an automobile without the driver making any apparent effort to avoid hitting them, it is not difficult to find gross negligence.

On the other hand, and this is the version most likely accepted by the court, if darkness had arrived and it was necessary to have headlight illumination to observe properly, then accused was operating his vehicle without any concern for the lives of others. He drove at a speed in excess of thirty miles an hour along a dimly lit highway without the benefit of headlights when he knew he might encounter pedestrians. The principal obstacle preventing him from seeing persons using the roadway was darkness, and he failed to use the best means of overcoming that obstruction. For all practical purposes, he drove down the highway while blind, and that shows a wanton disregard for the rights of others who might be on the road. It is true that sometimes a person thoughtlessly fails to make certain that his headlights are burning, but that assumption cannot assist the accused because he testified he had turned his headlights off and his sidelights on shortly before the accident. Clearly the court-martial could find from this record that accused's omission consisted of a total disregard for the foreseeable consequences to those who were rightfully on the highway. By any standard that is culpable negligence.

Much is argued in the briefs and said in the Chief Judge's opinion about accused's explanation of the accident. Both might be meritorious if the court-martial was required to accept his testimony as true. However, my understanding is that triers of fact may reject an accused's version, and particularly is that true when he has made prior inconsistent statements. That is the situation here, for I find evidence in the record which indicates that his testimony given from the witness stand and that included in his pretrial statement are at variance with statements made on previous occasions. Such being the case, the court-martial could accept the testimony of the Government uninfluenced by accused's exculpatory assertions.

I concur with the manner in which the Chief Judge disposes of the certified question dealing with the closed session. However, I believe the last issue relating to the "cumulative effect of the errors of record" bears further development. Undoubtedly the question was certified because the dissenting member of the board of review used the principle as one of his reasons for reversal. The errors mentioned by him include these: Excessive use by trial counsel of leading questions; the law officer's erroneous rulings on objections to questions calling for conclusions from the witnesses; misquoting of the record by trial counsel; improper proof of British law on rules of the road; joinder of an earlier drunken driving offense to the prejudice of the accused; failure to grant a change of venue because of local hostility; and failure on the part of the law officer to give cautionary instructions on the limited use of certain evidence. The number of assignments are impressive, and some of them present borderline decisions. However, no error of substance is found in the record, and the cumulative effect of any errors on matters of less moment did not prejudice substantially the right of the accused to a fair trial. Therefore, I would answer that question by saying that the findings of guilt and sentence should not be set aside.

Judge FERGUSON did not participate in the decision in this case.