UNITED STATES, Appellant

v

RICHARD J. STONE, Private E–2, U. S. Army, Appellee

9 USCMA 191, 25 CMR 453

No. 10,570

Decided April 18, 1958

*First Lieutenant Avram G. Hammer* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel John G. Lee, First Lieutenant Jon R. Waltz* and *First Lieutenant John E. Riecker.*

*First Lieutenant Edwin E. Allen* argued the cause for Appellee, Accused. With him on the brief were *Colonel J. M. Pitzer, Colonel Edward M. O'Connell* and *Major Edward Fenig.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

We must approach this opinion with more than ordinary discretion as a number of the appellate exhibits considered by this Court have been classified by the Department of Defense. Consequently, although we feel that the arguments enunciated in the following decision are sufficient to substantiate our result, persuasive materials which further bolster our conclusion must, in the interest of national security, remain outside of the public ken.

The facts may be briefly stated. The accused, a member of the United States Army stationed at Tokyo, Japan, purchased from post exchanges two sets of golf clubs which were not for his own use. A general regulation of Headquarters, United States Army Forces, Far East, hereinafter referred to as AFFE, provides in part: "Persons authorized to purchase at exchanges will limit purchases to items which will be for their own use or consumption." AFFE Circular 141, paragraph 9(f), August 5, 1954. In accordance with Article 92 of the Uniform Code of Military Justice, 10 USC § 892, the accused was charged and convicted of violating this lawful general regulation. At no time during the trial did the Government attempt to prove that he had knowledge of the circular nor was the court instructed that it must find the presence of that alleged ingredient. An Army board of review, concluding that knowledge was a necessary element of the offense charged, reversed the conviction. The case is now before us pursuant to a certificate of review filed by the Acting The Judge Advocate General of the Army, who requested an answer to the following issue:

Is knowledge an element of the offense of violation of a general regulation emanating from headquarters, United States Army Forces, Far East?

## I

Article 92, Uniform Code, supra, punishes any person who violates or fails to obey any lawful general order or regulation. Specifically it provides for knowledge only when the order does not reach the level of a general order or regulation. Accordingly, proof of knowledge of a general order or regulation, we have previously held, is irrelevant in certain instances as it is conclusively presumed. United States v Arnovits, 3 USCMA 538, 13 CMR 94. The criterion which we have applied in ascertaining when an order or regulation reaches that class may be found in two sections of the Manual for Courts-Martial, United States, 1951, quoted below:

"A general order or regulation is lawful if it is not contrary to or forbidden by the Constitution, the provisions of an act of Congress or the lawful order of a superior. A general order or regulation is one which is promulgated by the authority of a Secretary of a Department and which applies generally to an armed force, or one promulgated by a commander which applies generally to his command. See 154a(4) (Ignorance of law) as to the necessity of proving actual or constructive knowledge of general orders or regulations in certain cases." [Paragraph 171a.]

"*Ignorance of law.* . . . Also, before a person can properly be held responsible for a violation of any regulation or directive of any command inferior to the Department of the Army, Navy, or Air Force, or the Headquarters of the Marine Corps or Coast Guard, or inferior to the headquarters of a Territorial, theater, or similar area command (with respect to personnel stationed or having duties within such area), it must appear that he knew of the regulation or directive, either actual-

ly or constructively. Constructive knowledge may be found to have existed when the regulation or directive was of so notorious a nature, or was so conspicuously posted or distributed, that the particular accused ought to have known of its existence." [Paragraph 154a(4).]

Accord, United States v Arnovits, supra; United States v Snyder, 1 USCMA 423, 4 CMR 15. Essentially, then, we must ask whether AFFE is a command inferior to the headquarters of a Territorial, theater, or similar area command. If this be so, there is no presumption of knowledge of its regulations and the conviction of the accused must be dismissed.

Our inquiry must proceed in two directions which become apparent as we develop our concept. In order to effectuate a logical arrangement of this opinion, we will first discuss the historical aspects of AFFE, the command which issued the regulation now under consideration.

## II

The establishment and formative development of the United States Army Forces in the Far East is succinctly discussed in United States v Lewis, CM 396226, August 26, 1957:

". . . it is noted in retrospect that Headquarters United States Army Forces in the Far East was organized on 27 July 1941—AG 381 (29 Jul 41) MB–E–M, 30 July 1941. Eventually, all units of the United States Army in the Far East (except Headquarters United States Army Forces in the Far East) and all elements in the Philippine Army called into the service of the Armed Forces of the United States were assigned to United States Army Forces, Pacific (General Order Number 5, Army Forces, Pacific, 9 June 1945). Subsequently, United States Army Forces in the Far East (short title USAFFE) was redesignated United States Army Forces Far East (short title AFFE) and concurrently Headquarters, United States Army Forces Far East was relocated from Tokyo to Yokohama, Japan, and all units

and activities assigned or attached to Japan Logistical Command were assigned or attached to United States Army Forces Far East effective 1 October 1952 (General Order Number 114, Far East Command, 30 September 1952, Department of the Army Circular 107, 1952)."

AFFE, then, stands as a major Army command in the Far East, but that is not to say it is necessarily the highest military command. Under the provisions of the National Security Act of 1947, 61 Stat 495, 496 (1947), as amended, the office of Joint Chiefs of Staff was formed and was given the authority to establish unified commands in strategic areas when such action is in the interest of national security. Under this authority, the Far East Command was redesignated Headquarters Far East Command, hereinafter referred to as FECOM, and commanded by a Commander-in-Chief, Far East Command. General Order 108, April 23, 1952, Headquarters, FECOM, effective April 28, 1952. The command was thereafter reorganized and the order effectuating this change suggests its posture in regard to AFFE:

"III. GENERAL. The Far East Command is reorganized with a joint headquarters and three major subordinate commands, in accordance with the spirit and intent of the Unified Command Plan.

"IV. MAJOR COMMANDS. The major subordinate commands of the Far East Commands are:

United States Army Forces, Far East
Naval Forces, Far East
Far East Air Forces." [General Order 169, December 10, 1952, Headquarters, FECOM, effective January 1, 1953.]

It is obvious then that AFFE is subordinate to FECOM. But in practical terms, what does this mean? The board of review in the instant case, pointing its finger at the word "subordinate," decided that its meaning was synonymous with "inferior" and looking toward the Manual concluded:

". . . The fact that USAFFE is the senior Army command in the area is of no moment to us if it is *inferior* to a Territorial, theater or similar area command. We believe the provision of the Manual is clear. The provision is unambiguous. This provision should be strictly adhered to by this Board." [United States v Stone, CM 396280, August 21, 1957, at page 5.]

The board then proceeded to cite a group of cases which apparently upheld its contention. See United States v Kitchens, 23 CMR 498; United States v Saunders, 1 CMR 663 (1951). We have carefully read these cases, contrasting them with the opinions of other inferior courts which have reached contrary results. See United States v Lewis, supra; United States v Westman, 14 CMR 285 (1953). Neither group of cases reaches an unreasonable result, yet in our final analysis we experience no hesitancy in rejecting the former and accepting the latter decisions. We are fortunate in being in possession of information which casts conditions in a little different light. Principally the board was influenced by the ■■■■■■■ word inferior used in the Manual provision. The word means lower degree of rank, and if joint commands were permanent and superimposed over all Services with tactical and administrative functions, the latter would be inferior in every sense of the word. But we lean to the belief that the framers of the Manual used the word in an intraservice rather than an interservice sense. Too many administrative matters pursue the usual chain of command within the Service to justify us in reaching a conclusion that Congress intended to merge all activities under a single joint command. ■■■■■■■ From information furnished, we consider a joint command more in the nature of an operational headquarters which may possess unusual powers during an emergency but which deals mostly with tactical and strategic planning during periods of peace. In that regard, we need go no further than to suggest that the framers of the Manual did not specifically refer to joint commands and we are not disposed to interpret the phrase "inferior to the headquarters of a Territorial, theater, or similar area command" to change the normal administrative functions of the individual Services. To do so would undermine the permanent structure of the separate Departments.

Perhaps our conclusion will be more readily comprehended if we rephrase the question which we originally posed. In what respects, we inquire, is AFFE subordinate to FECOM? FECOM is a unified command, an agency of the Department of Defense, which in 1946 was placed under the Department of the Army as the executive agent for the Department of Defense. JCS # 1259/27, 1946. On the other hand AFFE is directly under the jurisdiction of the Department of the Army, AR 320–5, paragraph 12c, January 21, 1952, and is considered by that agency to be one of its major overseas commands. SR 11–10–6, paragraph 3o, January 21, 1954. Indeed the National Security Act, which is the fountainhead of FECOM's existence, emphatically expresses the administrative autonomy maintained by each member force of a joint command:

"Sec. 401. In enacting [this legislation] . . . it is the intent of Congress to provide . . . three military departments, *separately administered,* for the operation and administration of the Army, the Navy . . . and the Air Force [and to provide] . . . for their *integration* into an efficient team of land, naval, and air forces *but not to establish a single Chief of Staff over the armed forces nor an armed forces general staff. . . .*" [50 USC § 401, 61 Stat 495, 496 (1947), as amended, 63 Stat 579 (1949). Emphasis supplied.]

Further, operational plans have been formulated which serve as a guide to two or more armed forces acting jointly or in conjunction with strategical unified commands. One of these documents entitled Joint Action Armed Forces, FM 110–5, JAAF, AFMI–1, September 1951, has laid out in great detail the distribution of responsibility

and authority among joint commands. There is a general discussion of unified commands, part of which we quote:

"30245. Command of Component Forces

"Forces assigned to a unified command will normally consist of two or more Service components each of which will be commanded directly by an officer of that component. Commanders of Service component forces will communicate directly with appropriate headquarters on matters which are not a responsibility of the commander of the unified command. Unless authorized to do so by the appointing authority, the commander of a unified command does not exercise direct command of any of the Service components or of a subordinate force. In exercising command, he shall take cognizance of the prerogatives and responsibilities of his Service component commanders as indicated in paragraphs 30249 and 30250.

. . . . .

"30251. Responsibilities of Component Commanders

"Each component commander [commanding officer of each Service unit assigned] is charged with the responsibility for making recommendations to the commander of a unified command on the proper employment of his component, and for accomplishing such operational missions as may be assigned by the superior authorized to exercise unified command.

"*a.* The component commander remains responsible in regard to his own Service component for—

"(1) *Internal administration and discipline except as otherwise provided in the appropriate section of this publication.*" [FM 110–5, Change 4, November 3, 1952, supra. Emphasis supplied.]

Under the situation in the instant case, it would seem that AFFE would have the primary responsibility for issuing regulations, a point which we will subsequently develop more fully. This is further substantiated by Section 4, Chapter 3, Joint Action Armed Forces

Manual, entitled "Administration and Discipline." This section clearly lays out the principle that the administration and discipline of the Armed Forces is primarily a uni-Service matter and should only be surrendered to the Commander of a unified command when it is a matter essential to the performance of his mission. There then follows a discussion on regulations:

"30411. Rules and Regulations

"Rules and regulations are, for the most part, uni-Service matters. In a joint force, however, some aspects of discipline must of necessity be handled by the officer commanding. Within authorized limits, rules and regulations covering such matters and applicable to all Services under his command should be established and promulgated by him. Examples of the subject matter to be covered by such rules and regulations are: those governing liberty areas; those governing the times at which personnel may be off military reservations; those governing apprehension of service personnel; and other such matters of common concern." [FM 110–5, supra.]

The above-quoted paragraphs, when interpreted in the light of certain classified material and, for that matter, even when considered alone, serve as illustrations of the fact that AFFE and similar commands cannot be said to be inferior to FECOM in the sense used in the Manual. Actually, both operate in the same geographical location but from a military point of view, they both enjoy a certain amount of flexibility. Contingent upon the exigencies of a situation, FECOM may undertake duties which are AFFE's primary responsibilities, but otherwise AFFE answers directly to the Department of the Army and is the supreme Army command in the Far East. One might say that AFFE *is* the Army in the Far East while FECOM is the representative of the Department of Defense.

### III

Now we may turn again to paragraph 154a(4) of the Manual, quoted above.

The reader will recall that the test adopted therein states that knowledge of a general order is presumed if the issuing command is a Department or Territorial, theater, or similar area command. Recall further that the board of review in United States v Kitchens, supra, and in the instant case interpreted this to mean that there could be only one Territorial or area command, the knowledge of whose regulations would be presumed, and any other subordinate command, regardless of its function, did not qualify under the Manual definition.

Under early military law personnel were "presumed to have a knowledge of the special laws and regulations governing the army, as well as of the General Orders which have been officially promulgated." Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 291. See also, section 4, Naval Courts and Boards, 1937; paragraph 126a, Manual for Courts-Martial, U. S. Army, 1928; Winthrop, Abridgement of Military Law, 4th ed, 1899, pages 110–111. This long-established rule was modified however with the promulgation of the Manual for Courts-Martial, U. S. Army, 1949. Paragraph 140 reads:

"*Ignorance of Law.*—Ignorance of the law, or of regulations or directives of a general nature having the force of law, is not an excuse for a criminal act. However, before a person can properly be held responsible for a violation of any such order or directive of any command inferior to the Department of the Army or the headquarters of an overseas theater or overseas or Territorial department (with respect to personnel stationed or having duties within such theater or department), it must appear that he knew of the order or directive, either actually or constructively."

The Naval Service rule was somewhat different for section 4, Naval Courts and Boards, 1937, provided:

"Knowledge of naval law required. —Each officer and enlisted man is presumed to have knowledge of the contents of Navy regulations and general orders; and although ignorance of them may be considered as an extenuating circumstance, it does not excuse one guilty of an infraction thereof nor relieve him from the consequences of his acts."

Substantially the same language appears in paragraph 154a(4), Manual for Courts-Martial, United States, 1951, quoted previously, as appeared in the Army and Air Force Manuals of 1949. From that we reason that the framers of the present Manual found the 1949 Army-Air Force concept to be the most desirable. See Legal and Legislative Basis for the Manual for Courts-Martial, United States, 1951, pages 245–246. It is to be noted, however, that in neither Manual was the Department of Defense mentioned and in the 1951 edition each Service headquarters is considered as an independent entity. It is to be further noted that the compilers of the Manual did not intend the commands to be limited solely to those which they enumerated. If they did, they would not have included the phrase "or similar area command," which strikes us as an invitation to apply the statutory rule of *ejusdem generis.* Prior to 1949, presumption of knowledge encloaked a broad body of regulations and no doubt some uniformity was desired. The ultimate purpose of the writers of the 1951 Manual was to set a balance between the various Service rules. See Legal and Legislative Basis, supra. What they wished to accomplish, and we are in full accord was to allow the presumption of knowledge to apply only to that category of regulations or orders which are issued by commands of the highest dignity. Cf. United States v Brown, 8 USCMA 516, 25 CMR 20. In this category they, of course, placed the Departments of the Army, Navy, and Air Force, and the Headquarters of the Marine Corps and Coast Guard. But they did not stop there, for they also included "the headquarters of a Territorial, theater, or similar area command." It seems reasonable then that this category refers to at least those commands which are major commands and only one step removed from the Departments of the Army, Navy,

**197**

and Air Force, and the Headquarters of the Marine Corps and Coast Guard. The commands, which have as their common basis the fact that they are directly under the Department of the Army, are classified by that Service as *major commands*. Dictionary of United States Army Terms, SR 320–5–1, page 170, November 1953. AR 320–5, paragraph 12, January 21, 1952. Included in the category of major commands are the continental armies, the Military District of Washington, and overseas Army commands which include United States Army Europe, and United States Army Forces in the Far East (AFFE). SR 11–10–6, paragraph 3o, January 21, 1954. We hold therefore that as AFFE is a "major command" directly under the Department of the Army, knowledge of its regulations may be presumed. We therefore answer the certified question in the negative.

### IV

Although we are reluctant to add to the length of this opinion, the importance of the concepts involved persuades us to delve into two corollary issues which flow from our decision. The question instantly asserts itself— what is the status of FECOM? Lest any one misconstrue this opinion, we emphasize that a presumption of knowledge follows the regulations of that command. Some would have us empaled on the horns of a dilemma by declaring that in a given territory there can be only one command, the knowledge of whose regulations are presumed, and thus having decreed that knowledge of AFFE regulations need not be proven, those of joint commands must be treated differently. One of the reasons we dwelt at such length upon the structure of the two commands in question was to refute such an argument. We have conceded that FECOM is the highest military command in the Far East for operational purposes and perhaps at given times for all purposes. Boards of review have so held and have colored its regulations with a presumption of knowledge. United States v Cascio, 16 CMR 799, 828 (1954); United States v Landrum, 14 CMR 827 (1954). Our decision is based upon the fact that both commands are the superior agents of their respective departments in the Far East. Each has an identity independent of the other, and both meet the requirements laid out in the Manual. We are convinced that we should apply the presumption of knowledge cautiously but we find no good reason to apply it exclusively.

### V

Our final consideration also arises from the complex operations of AFFE and FECOM. At no point in the trial or appellate proceedings has the lawfulness of AFFE Circular 141 been raised, and it is not this Court's intention to declare AFFE Circular 141 invalid. What we wish to do, however, is to clarify some apparent discrepancies which we have found in our research.

Regulation of exchange activity was promulgated by General Headquarters, Far East Command, in 1950 and was applicable to all Army and Air Force exchanges within its jurisdiction. Circular 54, General Headquarters, FECOM, 1950 (October 26, 1950). These were thereafter revised by the same command. Letter, AG 331.3 SS, General Headquarters, FECOM, June 27, 1951. When the Far East Command was reorganized in 1952, it issued the following Circular:

"1. This circular initiates a new series for Headquarters, Far East Command.

"2. Circular 26, 1952, is the last in the General Headquarters, Far East Command, series.

"3. General Headquarters, Far East Command circulars remain in full force and effect until rescinded in this series of circulars." [Circular 1, AG 300.6, April 28, 1952, AG, FECOM.]

Consequently Circular No. 54, as revised, was still in full force and effect at this time and apparently as late as January 1954. See United States v Landrum, 14 CMR 827, citing Letter, HQ, FEC AGJ 461, January 5, 1954.

The accused was convicted of a violation of regulations promulgated in AFFE Circular 141. That circular issued August 5, 1954, is entitled "Army and Air Force Exchange Activities," the very same subject matter which FECOM had regulated upon until this time. Moreover, AFFE Circular 141 applies to all Army and Air Force Exchange activities in the entire Far East Command (paragraph 2) and purports to supersede prior FECOM regulation 54 (paragraph 31). Did AFFE, the subordinate command, have the power to supersede the regulation of FECOM, the superior command? Once again our detailed discussion of the posture of the two commands holds us in good stead in arriving at a decision. There we emphasized that "Contingent upon the exigencies of a situation, FECOM may undertake duties which are AFFE's primary responsibility." Under the policy laid down by the Departments of the Army, Navy, and Air Force, a unified command would receive the widest authority under wartime conditions. The Manual, Joint Action Armed Forces, supra, at paragraph 30246, relates:

". . . Under wartime conditions and where critical situations make diversion of normal logistic processes necessary, the logistic authority and responsibility of United States commanders under the Joint Chiefs of Staff are expanded to authorize them to utilize all facilities and supplies of all forces assigned to their commands as necessary for the accomplishment of their missions under the currently approved war plan being implemented. Responsibility for logistic support to component forces in these commands remains with the departments responsible for that support. Under conditions short of war, scope of the logistical and administrative responsibilities exercised by the commanders of unified commands will be consistent with the peacetime limitations imposed by legislation, departmental regulations, budgetary considerations, local conditions, and such other specific conditions as prescribed by the Joint Chiefs of Staff."

We note that the Korean Hostilities commenced during June 1950 in that area which FECOM and AFFE operate. See United States v Bancroft, 3 USCMA 3, 11 CMR 3; United States v Gann, 3 USCMA 12, 11 CMR 12; Pye, The Legal Status of the Korean Hostilities, 45 Georgetown L J 45 (1956). This Court has held that the "actual hostilities" terminated on July 27, 1953, but, of course, that is not to say that the state of emergency had ceased. United States v Shell, 7 USCMA 646, 23 CMR 110; United States v Busbin, 7 USCMA 661, 23 CMR 125. Therefore we assume—and not unreasonably—that during this period of emergency, FECOM pre-empted the field of Army and Air Force exchange regulations under the broad wartime powers which it must enjoy. FECOM's authority to so do was recognized apparently by the Commanding General of AFFE who, desiring certain exchange privileges to be clarified, requested FECOM to promulgate the same rather than attempting to do it himself. See Letter, AGJ 331.3, September 10, 1953, AJ–S, Headquarters, FECOM. But when the situation returned to some degree of normalcy, AFFE once again resumed its proper administrative role, the regulation of exchange activities, by issuing AFFE Circular 141, August 5, 1954. There is no question, then, as to the authority of AFFE to issue these regulations.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge QUINN and Judge FERGUSON concur.