UNITED STATES, Appellant and Cross-Appellee

v

OTHERIA STATHAM, Private E–2, U. S. Army,
Appellee and Cross-Appellant

9 USCMA 200, 25 CMR 462

No. 10,571

Decided April 18, 1958

First Lieutenant Avram G. Hammer argued the cause for Appellant, United States. With him on the brief were Lieutenant Colonel John G. Lee, First Lieutenant John E. Riecker, and First Lieutenant Jon R. Waltz.

Captain Arnold I. Melnick argued the cause for Appellee, Accused. With him on the brief were Colonel Edward M. O'Connell and Colonel J. M. Pitzer.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

As a consequence of one evening's activity, the accused was convicted of the offenses of unauthorized absence, violating a general regulation, reckless driving, and fleeing from the scene of an accident, in violation of Articles 86, 92, 111, and 134, Uniform Code of Military Justice, 10 USC §§ 886, 892, 911, and 934, respectively. These findings of guilty were affirmed, and his sentence was modified by the convening authority. An Army board of review set aside the findings based upon the violation of a general regulation, affirmed the remaining findings of guilty and approved so much of the sentence as provided for a suspended bad-conduct discharge, total forfeitures, and confinement at hard labor for nine months.

The case originally reached us under the aegis of the Acting The Judge Advocate General of the Army, who certified one question for review. Subsequently, the accused's cross-petition for review was granted upon three issues. Thus, these four questions are before us:

1. Was the evidence sufficient to sustain the accused's conviction of Charge III (reckless driving)?

2. Did the law officer erroneously permit the court-martial to inquire as to prior acts of misconduct of the accused?

3. Did the instruction of the law officer to the court-martial strip the accused of the presumption of innocence and shift the burden of proof to him?

4. Is knowledge an element of the offense of violating a general regulation emanating from Headquarters United States Army, Europe?

I

In determining the sufficiency of evidence to support the reckless driving conviction, the following facts are pertinent. On the night of March 17, 1957, the accused, accompanied by two companions, was driving an unregistered 1942 Plymouth without a driver's permit along the Gunzburger Strasse toward Leipheim, Germany. Because of frost damage to the road, the maximum speed was posted at 30 kilometers (18 miles) per hour. The accused's speedometer was not functioning, but one of his passengers estimated his speed at 50 miles per hour. However, military policemen in a patrol car that pursued the speeding vehicle testified that it was traveling at 80 miles per hour. The military police further testified that they sounded their horn, blinked their lights, and waved the accused over to the side of the road when he glanced at them. Although their car was a military vehicle and they wore the uniforms of military police, the accused claimed that he did not identify those in pursuit. However, one of his passengers testified that he

had told the accused that he should stop as the following automobile was probably driven by the police. It was at this time that the accused approached the cut-off which led to his unit area. As he slowed down to negotiate a left turn, he saw a motor scooter approaching from the opposite direction in the adjacent lane. What immediately transpired can be told through the testimony of the accused:

". . . As I approached the street that bears to the left that goes to the Kaserne from highway number 10, I noticed a man on a motor bike. I thought at first that he was approximately 100 yards from the corner where I intended to turn left to go to the Kaserne, I continued to turn thinking that I had enough time to make it. Just as I started to make the turn I hit him. I heard a loud noise, the right front windshield busted out. I guess I was pretty scared and continued to drive the car until I was stopped at the gate guard and the military police stopped me. I guess I was going about 50 MPH when I hit him."

The court-martial, by exceptions and substitutions, found that Private Statham on or about March 17, 1957, did operate a vehicle, to-wit: a passenger car in a reckless manner by driving at a speed in excess of fifty miles per hour, by making a left turn in the path of an oncoming vehicle and did thereby cause collision and injure Peter Alt.

Reckless driving, a violation of Article 111, Uniform Code of Military Justice, 10 USC § 911, is discussed at paragraph 190, Manual for Courts-Martial, United States, 1951. It states the generally recognized principle in the following language:

"The operation of a vehicle is 'reckless' when it exhibits a culpable disregard of foreseeable consequences to others from the act or omission involved. Recklessness is not determined solely by reason of the happening of an injury, or the invasion of the rights of another, nor by proof alone of excessive speed or erratic operation, but all such factors may be admissible and relevant as

bearing upon the ultimate question: Whether, under all the circumstances, the accused's manner of operation of the vehicle was of that heedless nature which made it actually or imminently dangerous to the occupants, or to the rights or safety of others. It is driving with such a high degree of negligence that if death were caused, the accused would have committed involuntary manslaughter, at least."

Recklessness is largely a relative matter, and evidence of all the surrounding circumstances is competent in proving the offense. Some matters of probative value are excessive speed, the condition of the road, time of day, the amount of traffic, and the condition of the vehicle. A number of those factors are reflected in this record and, when we apply the circumstantial test to accused's conduct, a pattern of recklessness unfolds. The automobile which the accused drove was fifteen years old and was unregistered because, as the accused knew, it needed repairs before it could pass inspection. The speed limit upon the highway was eighteen miles per hour, but the accused was traveling at least fifty miles per hour and possibly eighty miles per hour as he approached the cut-off. The turn at which the accident occurred was extremely sharp, and the accused saw the victim approaching, but he admitted negotiating the curve at fifty miles per hour. Further competent evidence indicates that he was seeking to avoid being apprehended by the police, and speed around the turn would aid that cause. Finally, he knew that he had violently struck a motor bike as the victim was flung against the windshield and across the roof of the Plymouth. Yet he not only failed to stop immediately but continued his flight until a steel barrier was lowered in his way. Some, but not many, of these facts were disputed, but that does not concern us as we need only determine whether the evidence is sufficient to support the findings of guilty. United States v McCrary, 1 USCMA 1, 1 CMR 1. The evidence here is sufficient for that pur-

pose as it was in United States v Sims, 7 USCMA 88, 21 CMR 214, where we were confronted with a similar question. The conviction upon Charge III is, therefore, affirmed.

## II

During the trial, the accused placed witnesses upon the stand to testify to his good character. One of these, a Sergeant Shipley, testified to the nature of accused's service, stating that he was a good soldier and enumerating specific acts to illustrate his point. Thereafter, the witness was questioned by Captain Bolender, a member of the court. The questioning is reproduced here:

"Captain Bolender: You have known the accused for eighteen months or better?

"A That is approximate. I have been there since August 24, 1954.

"Captain Bolender: Has he always been a private in that time?

"A No, he got promoted to Pfc at one time and then he was reduced. I forget what it was, but so far as duty was concerned, so far as soldiering, it wasn't concerned with that.

"Capt Bolender: His reduction was not concerned with soldiering?

"A No.

"Q His behavior then?

"A His behavior is very good.

"Capt Bolender: Was his reduction the result of his behavior?

"A I don't know what it was because at that particular time I was with the first bridge platoon and Statham is in the second bridge platoon, but I have known him ever since he has been in the organization.

"Q In other words, it has been eight months since he has been reduced?

"A To say offhand how long it has been since he was reduced, I couldn't say."

Appellate defense counsel argue that this interrogation brought before the court-martial knowledge of specific acts of misconduct committed by the accused, materially prejudicing his defense. The Government attacks this

contention with impressive arguments, but we need only concern ourselves with one. The evidence is not necessarily damaging, and the questioning, rather than eliciting a specific act of misconduct, merely cast some doubt on the character of accused's service and possibly weakened the witness' testimony that accused was a good soldier. Paragraph 138*f*(2) of the Manual for Courts-Martial, United States, 1951, discusses character evidence. In part it says that:

"In order to show the probability of his innocence, the accused may introduce evidence of his own good character, *including evidence of his military record and standing* and evidence of his general character as a moral well-conducted person and law-abiding citizen . . . . After the accused introduces evidence as to his good character, the prosecution may, in rebuttal, introduce evidence as to his bad character. However, the character evidence in rebuttal which may properly be received will be limited *by the scope of the character evidence introduced by the accused.*" [Emphasis supplied.]

The accused, having made an issue of his military record and standing, opened up that area, and testimony tending to show to the contrary is relevant. Here the cross-examination was well within bounds. We, therefore, perceive no error in this regard.

## III

The third allegation of error arises from the instructions which the law officer gave to the court- martial. At the commencement of the trial, that official stated:

"Gentlemen of the court, when this court closes to vote on its findings, each of you must resolve the ultimate issue as to the guilt or innocence of the accused in accordance with the law, the evidence you have heard in court and your own conscience. It is my duty as law officer of this court to instruct you on the law, it is your duty as members of the court to determine the facts of the case, apply

the law to these facts, and determine the guilt or innocence of the accused."

The accused now complains that this language stripped him of his rightful presumption of innocence and shifted to him the burden of proof. The argument is made that, because the law officer used the phrase "determine the guilt or innocence of the accused," he led the members to believe that the accused must establish his innocence. The contention is novel but not persuasive. Here the questioned phrase means to settle the question of guilt or innocence, and a finding of guilty or not guilty does just that without regard to the burden of proof. Furthermore, all the instructions are not included in one paragraph, and the burden of proof, presumption of innocence, and reasonable doubt were the subjects of later instructions.

Lest there be any doubt as to the coverage given by the law officer in those matters, we need only refer to his words which specifically dealt with them:

"First, that the accused must be presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt.

"Second, that in the case behind [sic] considered, if there is a reasonable doubt as to the guilt of the accused the doubt shall be resolved in favor of the accused and he shall be acquitted.

. . . . .

"Fourth, that the burden of proof to establish the guilt of the accused beyond a reasonable doubt is upon the government."

When considered by their four corners, the instructions charged the court-martial on all the essential elements of the offense and placed the presumption of innocence, burden of proof, and similar matters in their proper perspective. Cf. United States v Kentucky, 8 USCMA 553, 25 CMR 57.

Finally, it is not unusual for a judge in civilian practice to state that the jury should decide the guilt or innocence of an accused in accordance with

the law as given by him—for example, People v Murphy, 239 Mich 60, 214 NW 165 (1927); People v Tucker, 222 Mich 564, 193 NW 206 (1923); Branigan v State, 209 Wis 249, 244 NW 767 (1932)—and we dare suggest that the wording of the quoted instruction has been used in practically every case reaching this Court and in most cases tried in civilian courts. An instruction so universally used would have been discredited many years ago if it was subject to the interpretation that the accused must prove his innocence. This assigned error is, therefore, overruled.

IV

Having answered accused's contentions fully, we need only dispose of the certified issue to terminate this appeal. The two specifications contained under Charge II allege that the accused failed to obey a lawful general regulation promulgated by Headquarters, United States Army, Europe. This regulation proscribes the operation of an unregistered motor vehicle and the operation of vehicles without a valid operator's license. USAREUR Circular 643–30, September 7, 1955. At no time during the course of the trial was the accused's knowledge of these regulations proved. Rather, knowledge was presumed as provided for by paragraph 154a(4), Manual for Courts-Martial, United States, 1951.

In United States v Stone, 9 USCMA 191, 25 CMR 453, decided this day, we discussed presumption of knowledge of regulations issued by a major Army command directly under the Department of the Army but subordinate in some regards to a Department of Defense Joint Command operating in the same territory. We held that if an organization is a major command, directly under the Department of the Army, knowledge of its regulations may be presumed. The reasoning by which we reached this conclusion is carefully developed in United States v Stone, supra, and the relationship between the two commands therein discussed may easily be compared to that existing here between United States Army, Europe (USAREUR) and the European Com-

mand (EUCOM). As a matter of information, the parties agree generally to the similarity. Therefore, we need discuss this no further as a more than adequate expression of our views can be found in *Stone*. Suffice it to say that since United States Army Europe is a major Army command answering directly to the Department of the Army, see SR 11–10–6, paragraph 3*o*, January 21, 1954, knowledge of its regulations need not be shown affirmatively to support a charge under Article 92(a), Uniform Code of Military Justice, 10 USC § 892.

The decision of the board of review as to Charge II is reversed, and the record is returned to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge QUINN and Judge FERGUSON concur.