UNITED STATES, Appellee

v

MARLIN L. SILVA, Airman Second Class, U. S. Air Force, Appellant

9 USCMA 420, 26 CMR 200

No. 10,986

Decided July 3, 1958

*Captain Norman J. Nelson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ellis L. Gottlieb.*

*Captain John W. Fahrney* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Robert W. Michels.*

GEORGE W. LATIMER, Judge:

The accused was convicted of violations of Article 92, Uniform Code of Military Justice, 10 USC § 892, stemming from his alleged black-market activities while serving as an airman in England. Intermediate appellate authorities, while modifying his sentence, affirmed the court-martial's findings of guilty. We granted review to consider:

(1) Whether the evidence is sufficient to support the findings of violation of a United States Air Force Europe regulation (specification 1).

(2) Whether the law officer correctly instructed on constructive knowledge of said regulation.

The accused was charged in specification 1 with violating paragraph 15, USAFE Regulation 176–5, September 20, 1955:

" . . . by wrongfully selling an Omega Constellation Chronometer watch, serial # 14123770, purchased from the Air Forces Europe Exchange, to an unknown British Civilian, not an authorized Air Forces Europe Exchange patron."

In order to sustain the accused's conviction, the defense argues that the Government was required to show by competent and sufficient evidence that (1) an Omega watch (Serial Number 14123770) was purchased from an Air Force exchange (AFEX) by the accused; (2) that the watch was sold by him; and (3) to a person not an authorized Air Force Europe exchange patron.

As to the three ingredients enumerated above, the Government did not fail to meet its burden as the record contains competent and sufficient evidence to sustain the court-martial's findings on each element. A clerk at the AFEX, RAF Station, Manston, England, testified that she sold an Omega watch Number 14123770 to a customer who signed as "A/2d E. Rebart" or "E. Rebat" on February 4, 1956. A copy of the sales receipt and the log book of sales kept in the usual course of business was introduced in evidence and it indicated the date of sale, make, case number, and price of the watch and the customer's signature. The customer was not further identified during the trial.

On February 8, 1956, an Omega watch was delivered to the office of Investigator Williamson of Her Majesty's Commission of Customs and Excises, located in London, by a Mr. Meyer who said it was uncustomed and he wished to pay the duty. The serial number on the timepiece identified it as the one referred to above. Williamson was told by Meyer that the watch was purchased from a fellow-jeweler who was described as "short, five foot two and very corpulent [and] . . . Jewish."[1] Between this time and March 18, 1956, the accused was questioned in relation to black-market activities. Found among his possessions were an excessive number of AFEX luxury ration cards, made out to other airmen, tobacco products, watches, lighters and sundry other commodities.

From the foregoing it follows that the Government produced sufficient evidence to established the corpus delicti of the crime namely, that the particular regulation was violated by someone purchasing an Omega watch from an Air Force exchange and selling it to an unauthorized purchaser. The question then becomes whether the accused is identified sufficiently as the offender.

On March 19, the accused, after proper warning under Article 31 of the Uniform Code of Military Justice, 10 USC § 831, made an oral statement to Mr. Williamson and Agent Parker of the Office of Special Investigations. Both officers testified as to the contents of his statement, but Williamson's testimony is more comprehensive and we, therefore, quote his version. However, before setting out part of

---

[1] This hearsay evidence was elicited from the witness during cross-examination by defense counsel.

his testimony in haec verba, we call attention to the fact that he had previously stated from the witness chair that when he informed the accused that the watch which was in his possession could be connected up with the accused, the latter first contended that it was either lost by or stolen from him; and that when the accused was interrogated about his efforts to recover his property, he admitted the purchase and sale. The substance of accused's complete account of his dealing is found in this testimony:

"Q. Would you proceed, sir.

"A. Airman Silva tole [sic] me that the watch had been purchased at his instigation from AFEX by Airman Blicharski. He had given Airman Blicharski $70.00 to buy it. Airman Blicharski had given him the watch as soon as it was purchased or within 20 minutes or so. He had put it on his wrist and gone to London. During that evening he was at a club and on the following morning, on Sunday, when he woke up at his hotel it was gone and he realized it had been stolen. I questioned him about the lose [sic] and what action he had taken to recover it. He said he hadn't taken any action whatever to recover it. I put it to him that the watch had not been lost but in fact sold and he did finally admit to me he sold it to a fat man on the dilly. 'I sold it to a fat men [sic] on the dilly'. I found from that he meant Piccadilly. He said the man usually stands at the tube entrance on the Haymarket, Piccadilly. He said he was a British National, Jewish but certainly wasn't American. I asked him if he had his own luxury card and he produced it and I asked him to read the regulation on the back of the card, which he did. These regulations, to the best of my recollection, point out that it is an offense to deal in certain ways with goods bought on this luxury card. I then said, 'You know it is an offense under British Regulations to do this?' and he said he did know it was an offense under British law. We did discuss the point of certain American goods, sigarettes [sic] bearing the marking of duty free. He said he knew of those markings on cigarettes. I felt he knew sufficient about the British regulations on Customs and Excise to caution him and I cautioned him in accordance with British Law. He said he did not wish to make a statement and I finished my questioning at that point."

On cross-examination Williamson linked the accused even more closely to the watch.

"Q. You showed him the watch?

"A. Yes.

"Q. And he positively identified it by number as the one he had gotten?

"A. No, I showed him the watch initially. He said he had dealt recently in a similar watch and explained the circumstances under which he dealt with such a watch. I then told him by checking the numbers kept by AFEX and checking the numbers by Omega I was satisfied it was the watch he purchased and he accepted that as correct.

"Q. So you showed him the watch and he said he had such a watch?

"A. And accepted the one I showed him was the one, yes."

These admissions of the accused, introduced into evidence after the Government had established the corpus delicti of the crime, established the following: That on February 4, 1956, the defendant, through another airman, purchased an Omega watch from the Air Force exchange doing business at the RAF Station, Manston, England; that in Piccadilly he sold the watch to a short, fat man of Jewish extraction whom he characterized as a British national; and, finally, that the timepiece involved in these transactions was the very same one which Inspector Williamson had received from Mr. Meyer. That testimony very effectively identifies the accused with the sale of post exchange merchandise to an unauthorized purchaser. However, it is contended by defense counsel that the accused did not identify the watch by serial number and, therefore, his acceptance of the investigator's accusa-

tion was meaningless. True it is that the serial number was not used as a means of identification, but that is not required. There are other methods of ascertaining the identity of watches, and accused would be in the best position to know if the property shown to him was the subject of his prior purchase and sale. That knowledge could come from a number of sources, and apparently accused was content to be the identifier of the contraband property. While it is apparent from the record that the terms employed by the witness are foreign to the expressions used by American investigators, it is clear the accused admitted that the watch shown to him was the watch he had obtained from the exchange. Accordingly, the evidence is sufficient to support the findings.

The second error need not detain us. The regulation involved in this action was issued by the United States Air Force Europe. The law officer gave an instruction dealing with constructive knowledge of USAFE Regulations. In United States v Stone, 9 USCMA 191, 25 CMR 453, and United States v Statham, 9 USCMA 200, 25 CMR 462, decided after the grant of review in this case, we held that knowledge is not an element of the offense of violating a regulation emanating from a "major command." As United States Air Force Europe is a major command within the purview of those cases (see AFR 23–20, February 8, 1957), the instructional error, if any, was beneficial to the accused.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.