UNITED STATES, Appellant

v.

MAX SNYDER, Staff Sergeant, U. S. Marine Corps Reserve, Appellee

1 USCMA 423, 4 CMR 15

No. 409

Decided June 5, 1952

CAPT. Wesley C. Blake, USMC, for Appellant.
LT. Fredric T. Suss, USNR, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

### I

The accused, Snyder, a Marine Corps staff sergeant, was tried by general court-martial at Camp Lejeune, North Carolina, on four specifications alleging offenses under the Uniform Code of Military Justice, 50 USC §§ 551–736. The first three specifications alleged attempts to entice other named persons to engage in sexual intercourse with a female in violation of Article 134, 50 USC § 728. The last alleged a failure to obey a lawful regulation in violation of Article 92, 50 USC § 686. The accused was found guilty under all charges and specifications and sentenced to receive a bad-conduct discharge, to forfeit all pay and allowances, and to be confined at hard labor for one year. The convening authority reduced the confinement to 6 months but otherwise approved. A board of review in the office of The Judge Advocate General, United States Navy, held that the specifications laid under Article 134 did not state military offenses, but affirmed the findings as to the charge and specification alleging failure to obey a lawful general regulation. The board further reduced the confinement to 4 months. The Judge Advocate General, United States Navy, has certified the following questions to this Court, pursuant to the provisions of Article 67(b)(2), Uniform Code of Military Justice, 50 USC § 654:

"(a) Were offenses in violation of Article 134, Uniform Code of Military Justice, alleged in the three specifications of Charge I?

"(b) Was an offense in violation of Article 92, Uniform Code of Military Justice, alleged in the specification of Charge II?"

### II

At the outset we address ourselves to the question of legal sufficiency of the first three specifications. The first specification alleges that █ the accused ". . . did at Camp Lejeune, North Carolina, on or about June 23, 1951, wrongfully and unlawfully attempt to entice Master Sergeant Herbert L. Loewig, U. S. Marine Corps, to engage in sexual intercourse with a female to be directed to him by the said Snyder." The second and third specifications are identical with the first in phrasing, save that the attempt at enticement in the second is alleged to have been directed toward Chief Hospitalman Paul E. St. Sing, and in the third toward Staff Sergeant Harry H. Schick.

Evidence adduced at the trial shows that early in the afternoon of the date alleged the accused was present in the Staff Non-commissioned Officers Club, Courthouse Bay, accompanied by a

woman and her two children, aged six and four. As Chief St. Sing entered the Club he was called by the accused to the table at which the latter and his three guests were sitting. Thereupon in the presence of the woman and children, and with a gesture in the former's direction, the accused in vulgar terminology invited Chief St. Sing to engage in sexual intercourse with her. Following an expression of surprise from the Chief, the invitation was repeated, together with the inquiry, "Where can you take her?" The proposal was accepted as an entirely serious one by the recipient, who rebuked the accused and left the table. Shortly thereafter a similar invitation was extended in differing but equally lewd language to Master Sergeant Loewig as he entered the Club. Later in the afternoon the accused, accompanied by the woman, but without the children, entered Building No. BB–12, occupied as barracks, and there made a similar proposal to Staff Sergeant Schick, who was found asleep on his bunk. On being ordered from the building by a warrant officer who had observed the woman's presence and overheard the indecent invitation, the pair departed. The testimony of numerous witnesses established that, although the accused had been drinking—he had taken two mixed drinks at the Club—he was quite sober.

The accused was here charged under what has been characterized as the "general article." In the treatment of various forerunners of the present Article 134, the following language appears in Winthrop, Military Law and Precedents, 2d ed., 1920, page 720:

"This provision, taken originally from the British military law, was in substance incorporated in our first code of 1775, and has similarly appeared in each subsequent issue of our Articles of war. As will be illustrated in construing its separate terms, its evident purpose was to provide for the trial and punishment of any and all military offences not expressly made cognizable by courts-martial in the other and more specific Articles, and thus to prevent the possibility of a failure of justice in the army."

Pertinent portions of the language of Article 134, supra, are set out below:

"Though not specifically mentioned in this code, (1) *all disorders and neglects to the prejudice of good order and discipline* in the armed forces, (2) *all conduct of a nature to bring discredit* on the armed forces, and (3) *crimes and offenses not capital*, of which persons subject to this code may be guilty, shall be taken cognizance of by . . . court-martial . . . and punished at the discretion of such court." [Enumeration and emphasis supplied].

In speaking of "crimes and offenses not capital," the Manual for Courts-Martial, United States, 1951, paragraph 213*c*, page 383, provides as follows:

"Crimes and offenses not capital which are referred to and made punishable by Article 134 include those acts or omissions, not made punishable by another article, which are denounced as crimes or offenses by enactments of Congress and made triable in the Federal civil courts."

Because the misconduct charged in this branch of the case at bar has not been specifically denounced as a crime or offense by Congress, the third class of offenses mentioned in Article 134, supra, is of no immediate concern to us here. Likewise, since the alleged misconduct transpired in the semi-privacy of a military reservation, the second category need not detain us at length. Our primary inquiry, therefore, must relate to the first of the three clauses emphasized in the relevant Article as quoted above. In this connection we are reminded that "An irregular or improper act on the part of a member of the military service can scarcely be conceived which may not be regarded as in some indirect or remote sense prejudicing discipline, but the article [Article 134] does not contemplate such distant effects and is confined to cases in which the prejudice is reasonably direct and palpable." Manual for Courts-Martial, supra, paragraph 213*a*, page 381. See also Winthrop, supra, page 723. It would seem, therefore, that our inquiry in the instant case should be di-

rected to a determination of whether the misconduct alleged is palpably prejudicial to good order and discipline, and not merely prejudicial in an indirect and remote sense. In speaking of "all disorders and neglects," Winthrop, supra, has the following to say at page 722:

"In this comprehensive term are included all such insubordination; disrespectful or insulting language or behaviour towards superiors or inferiors in rank; violence; immorality; dishonesty; fraud or falsification; drunken, turbulent, wanton, mutinous, or irregular conduct; violation of standing orders, regulations, or instructions; neglect or evasion of official or routine duty, or failure to fully or properly perform it;—in fine all such 'sins of commission or omission,' on the part either of officers or soldiers as, on the one hand, do not fall within the category of the 'crimes' previously designated, and, on the other hand, are not expressly made punishable in any of the other ('foregoing') *specific* Articles of the code, *while yet being clearly prejudicial to good order and military discipline.*"

And on page 723 the same author uses the following language in his discussion of the phrase "to the prejudice of good order and military discipline":

"This descriptive phrase is so familiar to military persons that it hardly need be explained that 'prejudice' is used here in the sense of detriment, depreciation or as injuriously affecting.

"The term 'good order,'—inasmuch as most of the cases contemplated by the Article are cases of *military* neglects and disorders,—may be regarded as referring mainly to the order—*i.e. condition of tranquility, security and good government* [Emphasis supplied]—of the military service. Inasmuch, however, as civil wrongs, such as injuries to citizens or breaches of the public peace, may, when committed by military persons and actually prejudicing military discipline, be cognizable by courts-martial as crimes or disorders, the term 'good order' may be deemed, in cases of

such wrongs, *to include, with the order of the military service, a reference to that also of the civil community.*" [Emphasis supplied]

More recently, Article 134 and its immediate precursors in military law have been held to condemn drunkenness, use of profane language, wearing improper uniform, use of indecent language to a female, uncleanliness in person, and gambling. It has been said that it is readily ascertainable by definition and application that this Article is not intended to set up a moral standard for the conduct of an individual's affairs in private—provided, at least, that the questioned conduct does not interfere with the performance of military duties. To be the subject of proscription, acts of the character under scrutiny here must, as a general thing, involve or touch other persons. Thus, if a person chooses to use obscene language out of the hearing of other individuals, he does not thereby commit an offense in violation of Article 134. When, however, the language is used in the presence of other members of the armed forces, the action may, under certain circumstances, be prejudicial to good order and discipline.

The misconduct alleged here is extremely close to that involved in the offense of pandering commonly recognized in both military and civilian criminal law. It is apparent, in fact, that the present specifications were patterned closely on sample specifications alleging pandering found in the Manual for Courts-Martial, supra, Appendix 6, page 493. The only difference between the specifications utilized in the instant case, of course, and one charging the crime of pandering lies in the absence of an allegation here that financial gain from the solicited intercourse was contemplated. Pandering has long been recognized by the services as conduct prejudicial to good order and military discipline. United States v. Sanders, 1 CMR(AF) 694. Since this offense is not the subject of specific denunciation elsewhere in the Uniform Code of Military Justice, it would be chargeable properly as a violation of Article 134. It is now necessary that we determine whether the identical solicitation in-

volved here, if accompanied by an expectation of financial gain, must be regarded as a military offense, whereas the same conduct, if not so accompanied, may not be so considered. While there is indeed a marked difference between the two improper acts, is there a basic distinction as regards criminality? We think not. In support of this conclusion we refer to Caminetti v. United States, 242 US 470, 61 L ed 442, 37 S Ct 192, where the Supreme Court was faced with the problem of whether transportation for immoral purposes under the White Slave Traffic Act included a case in which there was no allegation of pecuniary profit. The Court spoke as follows at page 486:

"While such immoral purpose would be more culpable in morals and attributed to baser motives if accompanied with the expectation of pecuniary gain, such considerations do not prevent a lesser offense against morals of furnishing transportation in order that a woman may . . . become a mistress . . . from being the execution of purposes within the meaning of this law. To say the contrary would shock the common understanding of what constitutes an immoral purpose when those terms are applied, as here, to sexual relations."

And further support is derived from the military case of United States v. Neff, 20 BR 71. While the facts there differ slightly from those of the case at bar, and while the act of the accused was there held to be criminal as conduct of a nature to bring discredit on the military service, rather than as that prejudicial to good order and discipline, the following language at pages 74 and 75 is of interest:

"There is no allegation in the Specification, nor is there any reasonable inference from the testimony that the accused was to receive a portion of the $5 fee to bring the Specification within the purview of section 22–2707 of the Code of the District of Columbia, 1940, denouncing a procurer.

. . . . . .

"The Specification does, however, allege a wrongful and unlawful offer at Camp Gordon, and the evidence shows that the statement was made in the barracks. By such conduct, the accused was disorderly under such circumstances as to bring discredit upon the military service."

It is true, as urged by appellate defense counsel, that fornication, in the absence of aggravating circumstances, has been held not to be an offense under military law. United States v. Ord, 2 CMR (AF) 84. This is consistent with the view expressed earlier herein that Congress has not intended by Article 134 and its statutory precedessors to regulate the wholly private moral conduct of an individual. It does not follow, however, that fornication may not be committed under such conditions of publicity or scandal as to enter that area of conduct given over to the police responsibility of the military establishment. Likewise it does not at all follow that, because simple fornication is not an offense cognizable under military law, neither is enticement or an attempt at enticement thereto. Though related, the two acts are utterly different in quality. It is here alleged that Sergeant Snyder sought to entice three members of the armed forces to engage in fornication. By doing so, he clearly evinced to his fellow Corpsmen a wanton disregard for a moral standard generally and properly accepted by society. We certainly cannot say—comparing this act with others condemned by service custom—that it does not constitute a manifest example of conduct prejudicial to good order and military discipline.

### III

The second issue presented is whether the specification of Charge II alleges an offense in violation of █ Article 92, Uniform Code of Military Justice, supra, which provides as follows:

"Any person subject to this code who—

"(1) violates or fails to obey any lawful general order or regulation; or

"(2) having knowledge of any other lawful order issued by a member of the armed forces, which it is his

duty to obey, fails to obey the same; or

"(3) is derelict in the performance of his duties;

shall be punished as a court-martial may direct."

The language of this specification is set out hereafter:

"Specification: In that Staff Sergeant Max (n) Snyder, U.S. Marine Corps Reserve, Second Armored Amphibian Battalion, Force Troops, Fleet Marine Force, Atlantic, Camp Lejeune, North Carolina, on active duty, did, on or about June 23, 1951, violate a lawful regulation, to wit, Chapter 16–1, I Camp Regulations dated 12 July, 1949, 'Civilians will not be permitted to enter any barracks or building except when authorized to do so by a commissioned or warrant officer assigned to duty with an organization occupying the barracks. Female civilians will not be permitted to enter the barracks or parts of camp occupied by troops as living quarters. Civilian employees who have official business in quarters or other buildings shall be provided with a work order or special pass to authorize entry into such quarters or buildings. Occupants of quarters may require that this work order or pass be exhibited before allowing entry into quarters,' in that he did permit one Gertrude Williams to enter building number BB–12 and that he did accompany said Gertrude Williams into said building number BB–12."

The specification on its face alleges a violation of section (1), Article 92, violation of a "lawful . . . regulation." In discussing this Article, the Manual for Courts-Martial, supra, paragraph 171a, defines a general regulation as follows:

"A general order or regulation is one which is promulgated by the authority of a Secretary of a Department and which applies generally to an armed force, or one promulgated by a commander which applies generally to his command. See 154a(4) (Ignorance of law) as to the necessity of proving actual or constructive

knowledge of general orders or regulations in certain cases."

Paragraph 154a(4) provides as set out below:

"Also, before a person can properly be held responsible for a violation of any regulation or directive of any command *inferior* to the Department of the Army, Navy, or Air Force, or the Headquarters of the Marine Corps or Coast Guard, *or inferior* to the headquarters of a Territorial, theater, or similar area command (with respect to personnel stationed or having duties within such area), it must appear that he knew of the regulation or directive, either actually or constructively." [Emphasis supplied]

The clear import of the language of this latter paragraph, when viewed in the light of paragraph 171a, and applied to the situation involved in the instant case, is that commands inferior to the Headquarters of the Marine Corps, or theatre and similar areas of command, may issue lawful orders and regulations of general application—that is, general orders and regulations. This interpretation is buttressed by pre-existing law. Article 92(1) represents a consolidation of previous Army and Navy law. Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 258; Index and Legislative History, Uniform Code of Military Justice, House Hearings, page 1227. Under the Articles of War and the older dispensation, offenses covered by the present Article 92(1) would have been punished under Article of War 96, 10 USC § 1568, conduct to the prejudice of good order and military discipline. With the exception of violations of general orders issued by the Secretary of the Navy, offenses under the present Article 92(1) were covered in Navy practice by Article 22, Articles for the Government of the Navy, 34 USC § 1200, conduct to the prejudice of order and discipline. See Article 8(20), Articles for the Government of the Navy. However, it will be noted that the term "general order" is new. Under previous Army and Navy law, the orders involved in the offenses under discussion were referred to as "standing orders." In view of the leg-

428

islative intent to codify pre-existing law as to these offenses, we think it clear that the term "general orders" as used in Article 92(1) is synonymous with the previous term "standing orders."

The term "standing orders" has been consistently interpreted to include orders ranging from those issued by a Department down to those promulgated by the commander of a post, ship, or station. See Manual for Courts-Martial, U. S. Army, 1949, page 333; Naval Courts and Boards (1937), § 98; United States v. Gilloon, [ACM 1216] 1 CMR (AF) 560; United States v. Dunn, [ACM 2291] 2 CMR(AF) 561; Winthrop, Military Law and Precedents, 2d ed., page 573. The regulation in this case was issued by the commander of Camp Lejeune, North Carolina. We believe it is clear that an infraction of this directive may be alleged as an offense under Article 92(1), Uniform Code of Military Justice, supra.

We next deal with the question of whether the specification of Charge II, as written, is legally sufficient. In United States v. Marker, (No. 281), 1 USCMA 393, 3 CMR 127, decided May 19, 1952, we wrote as follows:

"Fortunately we are no longer bound by the ancient rigor of pleading at common law. It is the modern rule that formal defects in indictments, not prejudicial, will be disregarded. 'The true test of the sufficiency of an indictment is not whether it could have been more definite and certain, but whether it contains the elements of the offenses intended to be charged.' Hagner v. United States, 285 US 427, 431. If the indictment informs the accused of what he must be prepared to meet, and is sufficiently definite to eliminate the danger of future jeopardy, it will be held sufficient. Martin et al v. United States, 299 F 287 (CA4th Cir); Roberts v. United States, 137 F2d 412 (CA4th Cir); Nye v. United States, 137 F2d 73 (CA4th Cir)."

This point of view has also been expressed in the Manual for Courts-Martial, supra, paragraph 87a(2), in the language set out below:

"The proceedings as to a specification should not be held invalid solely because the specification is defective unless it appears from the record that the accused was in fact misled by such defect or that his substantial rights were in fact otherwise materially prejudiced thereby. The test of the sufficiency of a specification is not whether it could have been made more definite and certain, but whether the facts alleged therein and reasonably implied therefrom set forth the offense sought to be charged with sufficient particularity to apprise the accused of what he must defend against, and whether the record is sufficient to enable him to avoid a second prosecution for the same offense."

The charge sheet language of interest here sets out verbatim the regulation allegedly violated, together with the facts constituting the asserted infraction. We fail to see how it can possibly be said to lack specificity. It sufficiently apprised the accused of the offense charged, in order that he might properly prepare his defense. The certain date, place, and name alleged in the specification—together with the evidence of record—provide adequate protection against a second prosecution for the same offense.

Appellate defense counsel urges that the specification should have alleged promulgation of the regulation and knowledge thereof on the part of the accused. This, we think, is more properly a matter for proof. This, too, is merely a re-enactment of pre-existing law. Manual for Courts-Martial, U. S. Army, 1949, paragraph 140; see Naval Courts and Boards (1937), § 4. Under previous Army and Navy practice it was not considered necessary to allege knowledge of any standing order, regardless of the level of command at which it was issued. Manual for Courts-Martial, supra, Appendix 4, page 333, Specification 185; Naval Courts and Boards, supra, § 98, page 88, Specification 17; United States v. Gilloon, supra; United States v. Dunn, supra. Knowledge of standing or general orders was and is a matter of proof, and then only where the type

**429**

of order concerned was issued by an inferior commander. Here, the law officer properly instructed the court that one of the necessary elements of proof was that the accused had knowledge, actual or constructive, of the camp regulation allegedly violated. Indeed there is nothing inconsistent with a requirement that a certain element of an offense be established by proof, even though the element need not be alleged specifically in the specification. Examples of this phenomenon are found in murder (malice aforethought); rape (against the will of the victim); larceny (intent permanently to deprive the owner of the property); and willful disobedience of an officer's order (knowledge that person is officer). See Manual for Courts-Martial, United States, 1951, Appendix 6, pages 475, 484.

Further infirmities in the specification of Charge II were claimed in the brief and argument of appellate defense counsel, and ably and forcefully presented to this Court. We have considered these claims at length, but find them to be without substantial merit. No detailed treatment of them is believed necessary to a proper disposition of the case.

IV

It follows from what has been said that all specifications of the case at bar were proper as a matter of law. Thus, the questions certified by The Judge Advocate General, United States Navy, are answered in the affirmative. However, this does not entirely dispose of the controversy. In United States v. Gilgallon, (No 286) 1 USCMA 263, 2 CMR 170, decided March 21, 1952, we used the following language, which is set out below with approval for application to the present case:

"As previously stated, the board of review is granted the authority to approve only so much of a sentence as it believes correct in law and in fact and determines, on the basis of the entire record, should be approved. The board has only approved so much of the sentence as did not involve a forfeiture; and, while it erred on a principle of law which should be corrected, we do not express an opinion on whether the case should be reconsidered on the entire record. While this Court can not increase the severity of a sentence affirmed by a board of review we have no disposition to influence any subsequent action it may believe legally justified by the record."

The record is returned to The Judge Advocate General, United States Navy, for action not inconsistent with this opinion.

Chief Judge QUINN and Judge LATIMER concur.