UNITED STATES, Appellee

v

COLEMAN L. BROWN, Specialist Third Class, U. S. Army, Appellant

8 USCMA 255, 24 CMR 65

No. 9670

Decided September 20, 1957

*First Lieutenant Philip L. Evans* argued the cause for Appellant, Accused. With him on the brief was *Major Edward Fenig.*

*First Lieutenant Chester F. Relyea* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused in this case was convicted of violating Article 134, Uniform Code of Military Justice, 10 USC § 934, in that he did, at Fort Knox, Kentucky, "wrongfully and unlawfully entice" three named enlisted men, as well as other persons unknown, to engage in sexual intercourse with prostitutes. Because one of the issues upon which review was granted relates to the sufficiency of the evidence to support this conviction, it is necessary to dwell at some length upon the evidence adduced at trial. At the outset we note that all material witnesses appearing at trial were—to say the least—most reluctant to testify and what testimony was elicited was painfully extracted.

On the evening of May 31, 1956, the accused, in the company of two sergeants, drove from Fort Knox, Kentucky—their duty station—to Louisville, Kentucky, in the accused's car. After spending several hours in town, they were approached by three women who requested the accused to transport them to Fort Knox. The accused and his companions had no objection to this request and agreed to take the women. Upon arriving at Fort Knox, the accused parked his car in an unlighted company area, which was physically located across from the Chapel and very close to a barracks housing trainees serving under the Reserve Forces Act of 1955, hereafter referred to as RFA trainees. The car's male occupants returned to their respective barracks leaving the women alone in the car but promising to return shortly. It was not long before word spread like proverbial "wildfire" that the women in the car were prostitutes desirous of transacting business. Soon two other cars joined the accused's and together this three-car caravan served as a base of operations. Before long a group of trainees estimated to number between fifteen and twenty were seen congregating around the cars in much the same manner as moths hovering around a flame. A steady crescendo of doors opening and closing and men entering and leaving the cars could be seen and heard throughout the area.

The real issue involved in this case concerns the identity of the accused as the person who enticed the trainees to engage in intercourse with the three Louisville prostitutes. As previously noted, the prosecution witnesses were extremely reluctant to testify and all apparently suffered from an acute case of memory failure. The first RFA trainee testified that a sergeant had appeared in the barracks disseminating information concerning the purpose and location of the three ladies. Shortly thereafter, the accused appeared in the barracks and, upon inquiry from one of the trainees concerning the authenticity of the report concerning the presence of the women, the accused was overheard to remark, "Yes, keep it cool." Upon hearing this remark, the witness informed his barracks mates who were unaware that "some men had some women in the car by the Chapel." He, however, neither saw nor heard the accused direct anyone to the cars.

The next RFA trainee called as a prosecution witness testified that he had been told by a man with "a round, fat face"—not the accused—that some women were available on the parking lot. He thereupon joined a group which was standing around the three cars and eventually had intercourse with one of the girls for a prearranged price. Upon first joining the group, he estimated that there were "about 15 or 20 boys" present but as the evening wore on "they kept coming more and more and we got kinda crowded down there." Although he noticed someone standing by the car—upon entering it and upon alighting from it—he was unable to identify him. After leaving the car, the witness returned to his barracks where he continued to watch the activities from the upstairs window. Eventually the three cars drove off and he heard one of the women yell out, " 'You

**256**

boys, if you want us any more just tell—' some sergeant, I didn't catch his name for sure." The witness was hesitant about identifying the accused at trial because he "didn't want to accuse anybody unless I am sure."

The third RFA trainee testified that upon hearing the news of the presence of the women, he and a friend went to the parking lot. He entered one car while his friend entered the other. He noticed the accused standing by one of the cars "talking to some of the boys out there" on the evening in question. He correctly identified the accused at trial. The accused had also been seen around the witness' barracks that night, although not inside. The witness was unable to recall ever having heard the accused say anything to anyone concerning the women.

The fourth and final RFA trainee witness testified that while standing by one of the cars a woman grabbed him by the hand and told him "to come on and get in the car." He saw a man standing by the car conversing with one of the women but he was unable to get a good look at him. After spending some time in the car the witness returned to his barracks where he watched others "getting in and out of the cars."

The prosecution introduced in evidence a statement obtained from the accused prior to trial. The statement was to a great extent exculpatory in nature. The accused, however, admitted that he had brought the women on the reservation and that during the evening he had noticed several men gathering around his car. He went to his car and asked the women what was going on. Their reply was "that some of the young soldiers wanted to make business." He then admonished them not to "make your business in my car." They inquired, "why not, we came in your car," to which the accused replied, "well forget about it," and walked away. He then met one of the women returning to the car accompanied by two soldiers. One of the trainees asked permission to go along with the woman and the accused replied, "I dont [sic] give a ——," and kept on walking.

Later that night he and one of the sergeants who had originally brought the women out, returned them to Louisville. They went directly to the bar—near where they had originally met the women—and had several drinks together. The accused vigorously maintained that he did not know that the women intended to practice their profession in his car; that he did not know the women were being paid by the trainees; that he did not receive any remuneration from the women for the use of his car; that he did not even know their names; and that he had never engaged in this sort of thing before. Following the introduction of the statement into evidence, the prosecution rested. The accused elected not to testify and no evidence was presented on his behalf.

I

The accused impresses upon us the argument that no persuasion, inducement or suggestion by him ■■■■■■■ ■ was "the efficient or moving cause of any soldier having relations with the three Louisville girls on the night of 31 May 1956 at Fort Knox." Surely we are not so incredibly naive—as the accused would have us believe—that we would entertain any serious doubt concerning the extent of the accused's participation in this sordid affair. Suffice it to say that considering the totality of the accused's conduct, including the transportation of the prostitutes on and off the reservation in his car, leaving them alone in the car, parked near the trainee barracks, knowingly permitting the prostitutes to use his car as a base of operations, appearing in the trainee barracks and by the car at various intervals during the night and his admonition to "keep it cool" when asked concerning the reliability of the report that prostitutes were available for hire in the car, we cannot say as a matter of law that the evidence is insufficient to support the court-martial's findings.

We are also unimpressed with the narrow limitations the accused places upon the word ■■■■■■■ ■ "entice." We adhere, instead, to the broader definition found in

**257**

Black's Law Dictionary, 4th ed, 1951, page 626:

"ENTICE. To wrongfully solicit, persuade, procure, allure, attract, draw by blandishment, coax or seduce. [Citation omitted.] To lure, induce, tempt, incite, or persuade a person to do a thing. [Citation omitted.]"

It certainly could reasonably have been anticipated that bringing three eager prostitutes on a military reservation and placing them in close proximity to a barracks housing young and immature trainees of 17 and 18 years of age, and then aiding in the dissemination of news concerning their presence, is conduct well-calculated to entice, encourage, and invite one to engage in sexual intercourse with the prostitutes. It was not necessary for the prosecution to show that the accused had personally tendered an invitation to the trainees—either by word or gesture—to visit the cars and avail themselves of the services being offered. This is truly a case for the imposition of the maxim that actions speak louder than words. We pass now to the second error assigned.

## II

The law officer, subject to objection by defense counsel, instructed the court-martial that the maximum authorized punishment for this offense was dishonorable discharge, total forfeitures and confinement at hard labor for five years. In an out-of-court conference, defense counsel argued that for punishment purposes the offense could only be equated to disorderly conduct. The trial counsel, however, took the view that the offense was "closely connected" with that of pandering, and that no material distinction existed. Paragraph 127c, Manual for Courts-Martial, United States, 1951, Table of Maximum Punishments, Section A, lists dishonorable discharge, total forfeitures and confinement at hard labor for five years as the maximum punishment authorized in the military for the offense of pandering.

In United States v Snyder, 1 USCMA

423, 4 CMR 15, the accused was convicted of an offense strikingly similar to that found in the instant case. This Court, in considering the nature of the conduct involved, stated:

"The misconduct alleged here is extremely close to that involved in the offense of pandering commonly recognized in both military and civilian criminal law. It is apparent, in fact, that the present specifications were patterned closely on sample specifications alleging pandering found in the Manual for Courts-Martial, supra, Appendix 6, page 493. The only difference between the specifications utilized in the instant case, of course, and one charging the crime of pandering lies in the absence of an allegation here that financial gain from the solicited intercourse was contemplated. Pandering has long been recognized by the services as conduct prejudicial to good order and military discipline. United States v Sanders, 1 CMR (AF) 694. Since this offense is not the subject of specific denunciation elsewhere in the Uniform Code of Military Justice, it would be chargeable properly as a violation of Article 134. It is now necessary that we determine whether the identical solicitation involved here, if accompanied by an expectation of financial gain, must be regarded as a military offense, whereas the same conduct, if not so accompanied, may not be so considered. While there is indeed a marked difference between the two improper acts, is there a basic distinction as regards criminality? We think not."

Recently, in United States v Gentry, 8 USCMA 14, 23 CMR 238, we had a case where the accused was convicted of unlawfully receiving money on account of arranging for four soldiers to engage in intercourse with a prostitute in violation of Article 134. The evidence, however, showed that the accused merely transported several soldiers to a house of prostitution. For this service he accepted $5.00 from each of the passengers. When they arrived at their destination, the accused waited outside while the four soldiers he had transported entered the house and had intercourse

with one of the prostitutes. Afterwards the accused drove the men back to camp. At trial it had been stipulated that the accused had no understanding or arrangements with the prostitutes. Under those circumstances we held the evidence insufficient to support a conviction of the offense charged or any lesser included offense. We said there that the accused's participation with patrons "only made it easier for four soldiers to reach a place where they could engage in sexual activities." We were careful to note that the crime condemned "must be more than that or the driver of a car can be charged with a sexual offense merely because he solicited passengers to pay for transportation to a house of illfame." It seems to us that the conduct engaged in by this accused goes considerably further than that involved in Gentry, supra, for here, although the accused did not transport the trainees to a house of illfame, he did what we consider even worse—he brought a house of illfame to the trainees.

Accordingly, we conclude that the law officer's instruction relating to maximum punishment was correct. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.