UNITED STATES, Appellant and Cross-Appellee

v

LAURESTON R. PORTER, Jr., Private, U. S. Army, Appellee and Cross-Appellant

11 USCMA 170, 28 CMR 394

No. 13,093

Decided January 22, 1960

Lieutenant Colonel James G. McConaughy argued the cause for Appellant and Cross-Appellee, United States. With him on the brief were *First Lieutenant Wade H. Sides, Jr.*, and *First Lieutenant George H. Parsons.*

First Lieutenant Frank J. Lane, Jr., argued the cause for Appellee and Cross-Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph Herrod.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Upon his pleas of guilty, accused was convicted by general court-martial of violating a lawful general order, and a breach of restriction, in contravention of Articles 92 and 134, Uniform Code of Military Justice, 10 USC §§ 892 and 934, respectively. He was sentenced to bad conduct discharge, total forfeitures, and confinement at hard labor for nine months, and the convening authority approved. The board of review affirmed the findings, but found the sentence to be excessive as a matter of law, and accordingly reduced it to partial forfeitures and confinement at hard labor for two months. Thereafter, the Acting The Judge Advocate General of the Army certified the case to this Court for determination of the following issue:

"Was the board of review correct in concluding as a matter of law that the applicable maximum punishment for violating the lawful general order under Charge II (by visiting Mexico without possessing required military documents) was that prescribed for a breach of restriction in violation of Article 134, Uniform Code of Military Justice?"

He also remitted so much of the accused's sentence as exceeded that affirmed by the board of review. Subsequently, accused cross-petitioned this Court and we granted review of this additional issue:

"Whether the specification of Charge II alleges an offense in violation of Article 92(1)."

Both issues before us involve the Article 92 offense, and because accused pleaded guilty, we are concerned solely with the specification laid thereunder. It alleges criminal misconduct in the following language:

"In that . . . [accused] did, at Naco, Sonora, Mexico, on or about 20 December 1958, violate a lawful general order, to wit: Paragraph 1b

**171**

(2), Section XV, Post Regulations, U. S. Army Electronic Proving Ground, Fort Huachuca, Arizona, dated 1 November 1957, Change Nr. 2, dated 15 May 1958, by visiting Naco, Sonora, Mexico, without having in his possession a properly issued Armed Forces Liberty Pass, DD Form 345, bearing on the reverse side 'Authorized to visit Mexico', countersigned by the accused's commanding officer authorizing the accused to visit the Republic of Mexico."

The specification being couched in language which alleges a violation of a lawful general order—namely, a post regulation of the U. S. Army Electronic Proving Ground, Fort Huachuca, Arizona—the answer to the granted issue must turn on whether that command was qualified, within the meaning of Article 92(1), to promulgate general orders and regulations. Indeed, at trial, individual defense counsel raised this very question upon accused's arraignment by a motion for appropriate relief, contending that the command did not have the requisite authority. The law officer, however, ruled adversely to the defense, and for the reasons hereinafter developed we conclude his action was correct.

In many cases this Court has had occasion to consider whether various commands were competent to promulgate general orders and regulations which could be used to support a conviction carrying a maximum sentence of two years' confinement. While our opinions have not always been unanimous, the principles bearing on that question have been developed at some length, so we need only determine whether the command with which we are presently concerned meets the tests the Court has previously prescribed.

The regulation was not merely the order of a company commander. United States v Brown, 8 USCMA ■ 516, 25 CMR 20. Rather, it emanated from the level of a "post, ship, or station," United States v Snyder, 1 USCMA 423, 4 CMR 15; United States v Wade, 1 USCMA 459, 4 CMR 51; and there is no indication that superior authority had restricted issuance of general orders by the command, United States v Bunch, 3 USCMA 186, 11 CMR 186. The missions and functions of the U. S. Army Electronic Proving Ground, Fort Huachuca, Arizona, as established and prescribed in Army Regulations 10–72, July 30, 1957, demonstrate beyond peradventure its important and substantial position in effectuating the mission of the Army. United States v Brown, supra. The commanding officer with whom we are concerned in this instance is a general officer, and we note that he exercises general court-martial jurisdiction. United States v Tinker, 10 USCMA 292, 27 CMR 366; United States v Keeler, 10 USCMA 319, 27 CMR 393; United States v Ochoa, 10 USCMA 602, 28 CMR 168. Additionally, Class II installations are those under the command of the head of a Headquarters, Department of the Army agency. Army Regulations 10–50, May 25, 1959, paragraph 2i (which supersedes Army Regulations 10–50, June 21, 1957—see paragraph 2h thereof). The U. S. Army Electronic Proving Ground, Fort Huachuca, Arizona, is a Class II installation and activity, under the jurisdiction of the Chief Signal Officer. Paragraphs II and III, Department of the Army General Orders No. 2, January 14, 1954. And that officer is a member of the Army Staff at the Department of the Army level which is immediately under the direction and control of the Secretary of the Army. 10 USC §§ 3031, 3032, and 3036. See also Army Regulations 10–5, May 22, 1957, paragraphs 18, 49, and 53. Thus it is apparent that the command is not "many steps 'removed' from" Department of the Army level, but, rather, is closely connected therewith. See United States v Keeler, supra, and United States v Ochoa, supra.

Accordingly, we are satisfied that the command herein concerned possesses the qualities indicative of and meets all existing tests this Court has previously spelled out for "major commands" competent to promulgate general or-

ders. Thus, the assigned error must be resolved against accused.

Because the tenor of the dissenting opinion suggests that we have ignored the realities of Army organization and missed certain pertinent regulations in resolving this issue, we turn our attention to the suggestions therein which contend for a conclusion contrary to that we reach. Principally those contentions are, first, that Fort Huachuca is not closely connected with Department of Army level, and, second, that in any event, regulations have stripped the commanding officer in question of authority to promulgate the order accused pleaded guilty to violating. Both arguments find their roots in the belief that jurisdiction is in fact exercised over Fort Huachuca by the Commanding General, Sixth United States Army. That approach overlooks the complete text of applicable regulations and the responsibility of the Commanding General of the Fort. Lest there be confusion, we note parenthetically that the officer who issued the regulation is not the Chief Signal Officer and, of course, as commander of both the installation and the facility there located, he has command responsibility. Moreover, if we are to consider regulations apparently vesting some authority in Zone of Interior army commanders, we deem it appropriate to pay heed to *all* their provisions. Paragraph 6e of Army Regulations 10–50, June 21, 1957, states that Zone of Interior army commanders will:

"Prescribe and enforce off-post military regulations within their respective geographical areas. In specifically designated areas in the vicinity of class II installations, local jurisdiction responsibility may be delegated by mutual agreement between the head of the Headquarters, Department of the Army agency and the Zone of Interior army commander concerned. See AR 380–430."

We point out that the regulation does not purport to vest responsibility in the Zone of Interior army commander to the exclusion of the Commanding Officer of Fort Huachuca. As a matter of more than passing interest, even assuming it did so, the regulation contains an express exception peculiarly pertinent to Fort Huachuca, which is a Class II installation. And in that connection, we note the specification alleged and accused pleaded guilty to a violation of the order here in question. He chose not to contest the legality of the order, and until now no one at any level has ever contended that the commander concerned lacked authority to issue the regulation dealing with the subject matter it did. No doubt they have been influenced in that regard by paragraph II, Department of the Army General Orders No. 2, January 14, 1954, supra, which relieved Fort Huachuca from jurisdiction of the Commanding General, Sixth Army, and activated it as a Class II installation under the jurisdiction of the Chief Signal Officer. Under those circumstances, we would resort to sheer speculation and fly full in the face of the presumption of regularity to hold that the commanding officer of Fort Huachuca arrogated to himself authority Army Regulations forbade him to exercise. Moreover, in case anyone has any doubt about the authority of the commander in question to curtail travel to Mexican border cities—whether by requiring possession of passes endorsed by certain officers of his command in order to visit Mexico, or by any other proper means— we invite attention to the provisions of paragraphs 24 and 25, Army Regulations 630–5, November 5, 1957.

The above factors are likewise dispositive of the second contention, based upon United States v Bunch, supra. Although it should hardly be necessary to point out, we see a great deal of difference between a Naval regulation which restricts issuance of certain orders to specified officers to the exclusion of any others, as in *Bunch*, supra, and a regulation with an express exception which may permit other commanders to operate in an area, as is the case in this instance. No great perspicacity is required to realize that a grant of authority to the Commanding General, Sixth Army, to prescribe and enforce off-post military regulations does not

necessarily negate authority of the commanding officer of Fort Huachuca to issue regulations which have to do with pass privileges of members of his command.

That leaves for determination the certified issue, which concerns the applicability of footnote 5 of the Table of Maximum Punishments, paragraph 127c, Manual for Courts-Martial, United States, 1951. In several prior cases, we have been confronted with that question. Those decisions have settled the law in the area, and there is no need to reiterate their teaching here. See United States v Buckmiller, 1 USCMA 504, 4 CMR 96; United States v Yunque-Burgos, 3 USCMA 498, 13 CMR 54; United States v Loos, 4 USCMA 478, 16 CMR 52; United States v Alberico, 7 USCMA 757, 23 CMR 221.

In the case at bar, as we noted earlier, the board of review affirmed the findings. However, on considering the sentence, the board reasoned as follows: That the effect of the order proscribing unauthorized visits to Mexico was to impose a restriction upon those persons not authorized to travel in that country; that accused's action thus constituted a breach of the restriction; that that offense was punishable under Article 134 of the Code; that footnote 5 was, therefore, applicable in fixing the sentence imposable for the Article 92 offense; and thus that one month was the maximum period of confinement which could be imposed upon accused for commission of that offense. Accordingly, the board found accused's sentence for his two crimes excessive as a matter of law.

We disagree with both the reasoning and the ultimate conclusion. We need not express an opinion on the holdings in the two cases upon which the board of review relied—United States v Jones, 23 CMR 444, and United States v Kalbaugh, 23 CMR 606—for in those instances the orders were of an entirely different nature. In *Jones*, all Korea except for limited described areas was made off-limits to a soldier

**174**

stationed there. As the opinion expressly points out, however, "so far, though, as the accused here was concerned, and others similarly situated, he was, in effect, restricted to his unit compound or area." 23 CMR at page 447. Likewise, in *Kalbaugh*, the regulation proscribed being anywhere except in one's quarters at certain times. To the contrary, in the instant case accused was not so restricted, but rather the regulation forbade only his going to Mexico without authorization. Fort Huachuca, Arizona, obviously is not located within Mexico, and we take notice that neither are any of its boundaries contiguous to our South border. Thus, accused was "restricted" by the regulation—if that be a proper characterization of his status—only to all the world save Mexico. There can be no doubt, then, that United States v Jones and United States v Kalbaugh, supra, are readily distinguished.

The board, however, argued that "It matters not whether the area be large or small." We encounter little difficulty rejecting that approach. One element required for proof of breach of restriction is that an accused has been duly restricted to certain designated limits. The regulation herein involved was restrictive only in the sense that it barred the accused from entry into Mexico without proper clearance and, for all practical purposes, it had no territorial limits. This limitation is somewhat akin to the one involved in United States v Tinker, 10 USCMA 292, 27 CMR 366, where we affirmed the findings and sentence of an accused for violating a general regulation which placed a certain house of ill repute off limits to service personnel. As here, that regulation had the effect of marking out a large area in which it could be said the accused was restricted, but principally it operated in the reverse and barred the accused from entry into the described area. True it is that an order can be couched in terms that effectively serve to proscribe a serviceman's freedom to leave a limited area but when, as here, the reason for the regulations is not to confine military personnel within a prescribed area but rather to

circumscribe their movement to and from foreign lands where they may involve the United States Government, no great discernment is necessary to recognize the difference between that situation and the mere leaving of a designated area under the control of the local commander. In that connection, it is to be borne in mind that travel of military personnel across an international boundary and into a foreign country—albeit one so friendly as Mexico—is fraught with many complications, and numerous reasons for controlling or banning that sort of travel by members of the armed forces spring readily to mind.

Thus, when we measure the facts of the case at bar by the yardstick we have spelled out for use in this area, and particularly when we consider the gravamen of accused's misconduct, we conclude that offenses of the type herein involved differ from and are far more serious than a simple breach of restriction. Accordingly, we hold that the board of review erred in applying footnote 5 to determine the sentence imposable for accused's violation of the general order. The certified question, therefore, is answered in the negative.

Normally that holding would require that the case be returned to the board of review for further action. Here, however, there is no infirmity in the findings, and the certified issue involves merely accused's sentence. As we have noted earlier, the Acting The Judge Advocate General has remitted so much of the sentence as exceeds that previously affirmed by the board of review. In light of that action, it is apparent that remanding the record for reassessment of sentence in accordance with our holding, would be an empty and unnecessary proceeding, for the board has already determined that accused's punishment, as remitted, is appropriate. Accordingly, the findings and sentence approved by the board of review are affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

With my brothers' decision in this case, the wheel completes its revolution upon the question of authority to issue lawful general orders and regulations, and we return to the situation which existed prior to our decisions in United States v Tinker, 10 USCMA 292, 27 CMR 366; United States v Keeler, 10 USCMA 319, 27 CMR 393; and United States v Ochoa, 10 USCMA 602, 28 CMR 168. Thus, we compound the confusion already rampant in this area and leave the armed services to reconcile opinions which are now in hopeless conflict.

The accused was convicted of violation of a lawful general order, "to wit: Paragraph 1b(2), Section XV, Post Regulations, U. S. Army Electronic Proving Ground, Fort Huachuca, Arizona, dated 1 November 1957, Change Nr. 2, dated 15 May 1958," in violation of Uniform Code of Military Justice, Article 92, 10 USC § 892. He was found guilty upon his plea and sentenced to bad-conduct discharge, total forfeitures, and confinement at hard labor for nine months. Intermediate appellate authorities affirmed the findings, but reduced the sentence upon the basis that it exceeded the legal maximum. The Judge Advocate General of the Army certified to this Court the question whether the board of review erred in limiting the maximum punishment for the violation of the order to another offense listed in the Table of Maximum Punishments, paragraph 127c, Manual for Courts-Martial, United States, 1951, and we granted accused's cross-petition for review on the question whether the specification alleged an offense. It is to the last proposition that I direct my disagreement with the majority, for I am certain that the Commanding General, Fort Huachuca, or any other officer in charge of an ordinary post, camp, or station is not authorized to issue general orders and regulations.

It is true that this Court, in United States v Snyder, 1 USCMA 423, 4 CMR 15, and United States v Wade, 1 USCMA 459, 4 CMR 51, equated general orders and regulations to "standing orders" under the Articles of War.

Thus, it concluded that these directives may be issued by a post commander. If I believed that *Snyder* and *Wade,* both supra, yet possessed vitality, I would join in affirming this case. Later decisions, however, indicate we have long since departed from the concept that general orders are standing orders and may be issued at the command level here involved.

In United States v Stone, 9 USCMA 191, 25 CMR 453, we upheld the authority of a theater command to issue lawful general orders and regulations. See also United States v Statham, 9 USCMA 200, 25 CMR 462. In United States v Tinker, supra, we found a similar power to exist in the Commander, United States Forces Azores, who was "the senior United States commander in the Azores with authority over substantially all United States personnel situated there, was responsible directly to CINCLANT, was the only United States commander in the Azores authorized to deal with Portuguese authorities in matters relating to the Azores, and was in a general sense *the United States Commander* in and for the area of the Azores." United States v Tinker, supra, at page 294. However, less than ten months ago, we decided that the Commanding Officer, Tachikawa Air Force Base, Japan, did not have the authority to promulgate general directives. United States v Keeler, supra. While the separate opinions in that case arrived at its holding by diverse reasoning, we soon gave it life in United States v Ochoa, supra, wherein the Chief Judge joined with me in holding that general orders and regulations could be issued only by major commands and defining those organizations as occupying a "substantial position in effectuating the mission of the armed services." United States v Ochoa, supra, at page 604. See also United States v Brown, 8 USCMA 516, 25 CMR 20, wherein it was unanimously stated that Code, supra, Article 92, was not intended to grant to all inferior commanders the power to issue general orders and regulations.

The essence of our holdings in United States v Tinker, United States v Keeler, and United States v Ochoa, all supra, is, as pointed out by Judge Latimer in his separate opinions in those cases, the limiting of United States v Snyder, supra, insofar as it purports to announce that the commanders of camps, posts, and stations, are authorized to issue general orders and regulations. This is particularly apparent in United States v Keeler, supra, involving an overseas Air Base and United States v Ochoa, supra, involving a Navy Training Center—both the equivalent of an ordinary Army post. What then are the circumstances which lead my brothers to decide that Fort Huachuca differs from these installations and constitutes a "major command"? I submit that a reasonable answer to this inquiry simply cannot be found in the prepared opinion.

Initially, Judge Latimer applies negatively the indicia which we have set forth in other cases. Thus, he points out that the order emanated from a post commanded by a general officer who exercises general court-martial jurisdiction. United States v Tinker, supra; United States v Ochoa, supra. This flatly ignores, however, our holding in United States v Ochoa, supra, that the possession of general court-martial jurisdiction was not controlling. United States v Ochoa, supra, at page 604. In short, the fallacy in his reasoning is that he gives conclusive effect to what we have said was no more than a circumstance to be considered.

Finally, it is argued that Fort Huachuca, as the Army's Electronic Proving Ground, occupies an important and substantial position in effectuating the mission of the Army, for it is a Class II installation directly under the "command" of the Chief Signal Officer. It is then reasoned that the installation is thus not "many steps 'removed' from" department level. This proposition simply ignores the realities of Army organization and gives binding effect to what constitutes no more than an administrative division of responsibilities.

It may be admitted that Fort Hua-

176

chuca has been designated as a Class II installation under the jurisdiction of the Chief Signal Officer. Paragraphs II and III, Department of the Army General Orders No. 2, January 14, 1954. An examination of pertinent directives will show, however, that the classification is of no moment here. Thus, AR 10–5, 22 May 1957, lists the Chief Signal Officer as a member of the Department of the Army technical staff. Paragraph 44*a*, AR 10–5, supra. With respect to his functions, the same paragraph points out:

"*c.* The heads of the technical staff are also heads of the technical services, in which capacity they command such troops, organization, activities, and installations as from time to time may be assigned. As chiefs of services, they perform the usual functions of command."

Paragraph 49 of the same regulations elaborates on the foregoing with respect to the Chief Signal Officer:

"49. *Chief Signal Officer.* The Chief Signal Officer plans, directs, and supervises signal communications, electronic, pictorial and cryptologistic activities of the Army; develops communications, electronic, pictorial, and, within the established national policy, communication security systems, services, and materiel; and provides and services signal materiel, communications and communication security devices, electronic devices (including those for Army aviation and battle area surveillance), and meteorological devices (except those for which responsibility is assigned to other agencies), and related activities (except for that weather forecasting performed for the Army by the Air Force) required for the Army and, as assigned, for the Navy, Air Force, and other governmental agencies and for foreign aid programs; and administers and operates the Alaska Communications System."

Paragraph 53 of the cited regulations further provides:

"53. *Class II and class III installations and class II activities.* Class II and class III installations and class II activities are under the command of the heads of certain Army Staff agencies. They perform missions and functions as assigned. See AR 10–50."

Uncritical acceptance of the foregoing regulatory provisions might well lead to the belief that the Chief Signal Officer has in fact command responsibility for the conduct of affairs at Fort Huachuca. However, as is frequently the case in military administration, other directives deprive the cited regulations of any real meaning and effect. Thus, AR 10–50, June 21, 1957, governs "SPECIAL COMMAND RELATIONSHIPS WITHIN CONTINENTAL UNITED STATES" and severely limits the authority of the Chief Signal Officer and other heads of Department of the Army agencies with respect to the command of Class II installations. Therein, it provides the following:

"6. **Responsibilities of Zone of Interior army commanders.** *Zone of Interior army commanders, under the command of the Commanding General, United States Continental Army Command, will—*

"*e. Prescribe and enforce off-post military regulations within their respective geographical areas.* In specifically designated areas in the vicinity of class II installations, local jurisdiction responsibility may be delegated by mutual agreement between the head of the Headquarters, Department of the Army agency and the Zone of Interior army commander concerned. See AR 380–430.

"*g.* Provide the support functions shown in figure 1 to class II installations and off-post class II activities within their geographical area commands on a common service (free) basis . . . Commanders of class II installations and off-post class II activities will be responsible to the appropriate Zone of Interior army commanders for carrying out policies and procedures of that commander in respect to all functions shown in figure 1." [Emphasis supplied.]

Briefly stated, the "support functions

shown in figure 1" include the general supervision of the administration of military justice, processing of claims, legal assistance functions, and the separation of all military personnel except Army hospital patients.

The basic mission assigned to Fort Huachuca is the study, testing, and development of signal operations, organizations, and equipment. AR 10–72, July 30, 1957. Although the Chief Signal Officer is apparently named the overlord of that installation, it is equally clear that his authority is limited to the development of matters relating to signal doctrine. Paragraph 5, AR 10–50, supra. The real jurisdiction over Fort Huachuca is exercised by the Commanding General, Sixth United States Army, in whose area it lies geographically. Paragraph 6, Appendix, AR 10–50, supra; paragraph 3f, AR 10–8, May 22, 1957. Thus, the latter controls the issuance of regulations having an effect beyond the limits of the reservation; supervises the administration of military justice; and provides other administrative activities. Nor is there anything unusual in this division of responsibility. It is obvious that technical training and research matters should be controlled by an officer skilled in the branch involved. It is equally obvious that he should not be saddled with responsibility for the incidental disciplinary considerations involved in the operation of a military post. Therefore, for all practical purposes, a chain of command is established for the latter purpose which travels through the Army area commander, and the Commanding General, United States Continental Army Command, to departmental level. For matters relating to Signal Corps materiel, a technical chain of command exists directly between the Electronic Proving Ground and the Chief Signal Officer. As it is the former path which concerns itself with orders and regulations, I am forced to disagree with Judge Latimer's assertion that Fort Huachuca is not many steps removed from administration by Department of the Army. United States v Ochoa, supra.

While the foregoing considerations convince me that United States v Ochoa, supra, and United States v Keeler, supra, are dispositive of the granted issue in this case, another factor is equally weighty. In United States v Bunch, 3 USCMA 186, 11 CMR 186, a unanimous Court held that a naval regulation limiting the classes of officers who might issue general orders and regulations was sufficient to deprive a commander not within those classes of any authority he might have otherwise had to promulgate that type of directive. Paragraph 6, AR 10–50, supra, in dividing the responsibilities of post administration between the respective commanders involved, expressly confers upon Army area commanders the authority to issue regulations governing off-post conduct. Thus, I find that, assuming the Commanding General, Fort Huachuca, to have had the power to issue general regulations ordering personnel to remain outside of Mexico unless they obtained special passes, such power was taken from him by the cited Army regulations. United States v Bunch, supra. Accordingly, I believe that the author Judge errs when he states that no authority has acted to restrict the authority of the Commanding General concerned. In consequence, I would find no authority in the Commanding General, Fort Huachuca, to issue the order in question.

In commenting upon the views which I have expressed concerning the applicability of United States v Bunch, supra, in light of the quoted provision of paragraph 6, AR 10–50, supra, the author of the principal opinion suggests that I overlook the authorization for delegation of responsibility for the issuance of off-post regulations by mutual agreement between the Army area commander and the commander of a Class II installation. He seems to believe that the failure of the accused to contest the authority to issue the order below this level and the presumption of regularity require us either to resort to "sheer speculation" or to conclude that authority existed to issue the general order in question. I am unaware of any authority for the position that the accused must at the trial or inter-

178

mediate appellate level assert a lack of authority in a commander concerned in order to maintain a contention before this Court. Indeed, such an assertion is no more than a contention that the specification involved does not allege an offense, and that argument may be presented before this Court for the first time. United States v Fout, 3 USCMA 565, 13 CMR 121; United States v Karl, 3 USCMA 427, 12 CMR 183. Moreover, I am unaware of any presumption that a commander acts within the scope of his authority in issuing orders and regulations. Such a position would give controlling significance to the allegation of an ordinary order as a violation of Code, supra, Article 92(1). Cf. United States v Bunch, supra, where a commander's order was in direct violation of naval regulations, a situation which my brothers seem to think unusual.

Finally, it is asserted that the Commanding General, Fort Huachuca, has authority to curtail visits to Mexico in view of the provisions of Army Regulations 630-5, November 5, 1957. Those regulations authorize varying classes of commanders, including those at posts, camps, and stations, to countersign passes for visits to foreign countries. Authority to countersign passes, however, is a far cry from authority to issue a general order requiring such passes to be countersigned. It is the latter proposition with which we are now concerned rather than whether it was proper for any level of command to insist upon limitations upon the authority of the accused to travel beyond the borders of the United States.

Summed up, it is my conclusion that our decisions in United States v Keeler and United States v Ochoa, both supra, effectively reversed the earlier holding in United States v Snyder, supra, to the effect that the commander of an ordinary post, camp, or station may issue lawful general orders and regulations. The authorities developed in those cases make it clear that it was not the intention of Congress in enacting Code, supra, Article 92, to authorize promulgation of such important directives at that level. United States v Brown, supra. Moreover, the majority ignores the effect of AR 10-50, supra, and our opinion in United States v Bunch, supra. In short, an *ad hoc* determination is made that the Commanding General, Fort Huachuca, Arizona, is authorized to issue these directives.

I would reverse accused's conviction of violation of a lawful general order, and return the record of trial to the board of review for reassessment of sentence on the remaining finding of guilty.