UNITED STATES, Appellant

v

ISIAH DANIEL CHUNN, Private, U. S. Marine Corps, Appellee

15 USCMA 550, 36 CMR 48

No. 18,653

December 17, 1965

*Lieutenant Harold C. Donegan,* USNR, argued the cause for Appellant, United States.

*Lieutenant Paul Gardner, Jr.,* USNR, argued the cause for Appellee, Accused.

## Opinion of the Court

QUINN, Chief Judge:

A special court-martial convicted the accused of two violations of the Uniform Code of Military Justice, and sen-

tenced him to a bad-conduct discharge, confinement at hard labor for six months, and partial forfeiture of pay. One of the specifications alleged that the accused violated a general order promulgated by the Commander, United States Naval Base, Subic Bay, Republic of the Philippines. Thereafter, a divided board of review held that the Naval Base was a fourth echelon command below the level of the Chief of Naval Operations, and the commander did not possess authority to promulgate general orders. It set aside the findings of guilty of that offense, and reduced the sentence to conform to the legal limits for the remaining offense. Pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Navy certified the following question to this Court:

"Was the board of review correct in holding, under the circumstances of this case, that Commander, U. S. Naval Base, Subic Bay, Philippines, did not have the authority to issue a general order the breach of which would permit prosecution pursuant to the terms of Article 92(1), Uniform Code of Military Justice?"

The problem of authority to promulgate general orders has been before this Court on a number of occasions. In United States v Brown, 8 USCMA 516, 25 CMR 20, we reviewed the procedure before the Uniform Code of Military Justice, and in the light thereof expressed doubt that Congress intended inferior commanders to promulgate general orders, a power "which had previously been reserved to the Secretary of a Department and to *commanders of major commands.*" (Emphasis supplied.) We further pointed out that a command possessed of the authority was one which occupied "a substantial position in effectuating the mission of the service." *Id.,* pages 518, 519. This point of reference was premised upon provisions in the Manual for Courts-Martial, United States, 1951, indicating that commands only one step removed from the Department level, such as, "headquarters of a Territorial, theater, or similar area command," fell within the category of major commands. Manual, supra, paragraphs 154a(4), 171a.

See also United States v Stone, 9 USCMA 191, 25 CMR 453. However, in United States v Tinker, 10 USCMA 292, 27 CMR 366, we held that position in the hierarchy of military command was not the exclusive bench mark by which to determine whether a particular commander had authority to issue general orders. In that case, the authority of Commander, United States Forces, Azores, was called into question. The command was two echelons below the Department level. Nevertheless, its functions, its responsibilities, and its other powers clearly demonstrated that it occupied a substantial position in the military establishment. *Id.,* page 294. Although it is a convenient point of beginning, the level of command responsibility is only one of the many factors that must be considered in determining whether the command is within or without the category of those empowered to issue general orders. United States v Porter, 11 USCMA 170, 28 CMR 394; United States v Ochoa, 10 USCMA 602, 28 CMR 168; United States v Keeler, 10 USCMA 319, 27 CMR 393.

In urging that we affirm the decision of the board of review, the accused concedes that the mission of the Subic Bay Base is "undoubtedly important"; but he still contends its military position is comparable to the Tachikawa Air Base, Japan, which, in the *Keeler* case, we held was not a major command; and substantially similar to the Naval Air Technical Training Center, Memphis, Tennessee, which, in the *Ochoa* case, we held did not have authority to promulgate general orders. With candor, counsel also concedes the existence of important differences. For example, in those cases, the command did not possess general court-martial jurisdiction; such jurisdiction, we said in *Ochoa,* at page 604, "is some evidence the organization involved plays a substantial role in the defense of our Nation"; the Subic Bay Base has such jurisdiction.

The board of review exhaustively reviewed the functions and responsibilities of the Base. Some of these, which were in effect at the time of the promulgation of the general order, are

listed below, in an arrangement somewhat different from that utilized by the board of review:

1. By designation of the Secretary of the Navy, the command relationships of the Naval Base were those of a "shore activity assigned to the operating forces, under the military command of Commander, U. S. Naval Forces Philippines." [SECNAV NOTICE 5450, March 7, 1961.] The chain of military command extended up from Commander, U. S. Naval Forces Philippines, to Commander in Chief, United States Pacific Fleet, and thence to the Chief of Naval Operations. However, "management control" of the Base was directly under the Chief, Bureau of Ships, a position then only one level below that of the Secretary of the Navy. [United States Government Organization Manual, 1961–62, Department of the Navy Organization Chart, page 620.]

2. The Base territorial jurisdiction included the boundaries of Subic Bay and such other "land areas in the Provinces of Zambales and Bataan reserved for naval purposes," pursuant to agreement between the United States and the Republic of the Philippines. [61 Stat 4019 (1947); for amendments thereto, see Treaties in Force on January 1, 1965, page 158.] The Base was one of the three largest operating bases in the Western Pacific.

3. The mission of the Base encompassed the following responsibilities:
   a. Maintain and operate medium Base facilities.
   b. Administer the areas assigned to its jurisdiction.
   c. Provide complete logistic support to locally assigned vessels.
   d. Provide limited logistic support to operating Fleet units, transient Naval vessels, and Naval activities in the Philippines.

4. Six activities located at Subic Bay were designated components of the Naval Base. These were:
   U. S. Naval Station
   U. S. Naval Ship Repair Facility
   U. S. Naval Supply Depot
   U. S. Public Works Center
   U. S. Naval Magazine
   Marine Barracks.

There were seventeen tenant activities at the Base. These were not under the military command of the Base Commander, but were apparently serviced by the Base.

5. The Base Commander had substantial responsibility in dealing with the Philippine authorities in connection with various important community activities. [See 10 United States Treaties and Other International Agreements 2169 (1959), TIAS 4388.]

6. The Base Commander was a flag officer, with general court-martial jurisdiction. No order by higher authority limited his power to issue general orders, if that power otherwise existed. [See United States v Bunch, 3 USCMA 186, 11 CMR 186.]

The magnitude and the nature of the Base operations, the number and the variety of the separate components under its jurisdiction, its level of authority in the area of Naval management, the rank and the general command powers exercised by its commander, so strongly reflect a position of substance and importance in effectuating the mission of the Naval establishment in the Pacific area as to require the conclusion that it possessed authority to promulgate general orders, notwithstanding it occupied a relatively low place in the hierarchy of "military command." United States v Porter, supra. Accordingly, the certified question is answered in the negative.

Apart from the certified question, certain matters in the record of trial merit attention. Apparently, material testimony of a Government witness was read from a written document, without any attempt to show the witness needed the statement to refresh his recollection, or that the statement was admitted as a contemporaneous memorandum of the events which it related. See United States v Bergen, 6 USCMA 601, 20 CMR 317.

Also, there is a substantial question as to whether the identification of the

accused as the person seen by the witness in a prohibited area was established only by inadmissible hearsay. See United States v Winters, 13 USCMA 454, 32 CMR 454. These matters were not briefed or argued because of the limited form in which the case was presented to this Court. They are appropriate matters for consideration by the board of review on remand.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Navy for resubmission to the board of review for proceedings consistent with this opinion.

Judges FERGUSON and KILDAY concur.